**In re Donald A. and Nancy KEMMER, Debtors.**

**James E. Salven, Chapter 7 Trustee, Plaintiff,**

**v.**

**Doug and Jean Munday, Defendants.**

**Bankruptcy No. 98–17800–B–7.
Adversary No. 00–1006.**

United States Bankruptcy Court,
E.D. California,
Fresno Division.

June 8, 2001.

226

**227**

Beth Maxwell Stratton, Law Office of Beth Maxwell Stratton, Fresno, CA, for plaintiff.

Christopher Hall, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, CA, for defendants.

MEMORANDUM OPINION

W. RICHARD LEE, Bankruptcy Judge.

This matter was tried before the court and taken under submission on March 26, 2001. Beth Maxwell Stratton of the Law Office of Beth Maxwell Stratton appeared for the plaintiff, James E. Salven, chapter 7 trustee (the "Trustee"). Christopher Hall of McCormick, Barstow, Sheppard, Wayte & Carruth appeared for the defendants Doug and Jean Munday (the "Mundays").

In this action, Trustee seeks to avoid a pre-petition transfer of real property made by the debtors, Donald and Nancy Kemmer (the "Kemmers") to the Mundays under 11 U.S.C. § 548(a)(1)(B)—a transfer made while the debtors were insolvent and for less than reasonably equivalent value. Alternatively, the Trustee seeks (by pre-trial motion to amend the complaint) to avoid the transfer under 11 U.S.C. § 548(a)(1)(A)—a transfer made with actual intent to hinder, delay or defraud creditors. Prior to trial, the Mundays sold the subject property to third parties who were not joined in this proceeding. The Trustee therefore seeks to recover not the property, but the value of the property pursuant to 11 U.S.C. § 550(a). The Mundays oppose the Trustee's motion to amend the complaint; they deny that the Trustee has a claim under either subpart of section 548(a)(1) and they assert a "good faith transferee" defense under sections 548(c) and 550(e).

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 548. This is a core proceeding to determine, avoid or recover a fraudulent conveyance pursuant to 28 U.S.C. § 157(b)(2)(H). This memorandum opinion contains the court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052. After careful consideration of the testimony and the evidence, and for

the reasons set forth below, the court rules in favor of the Trustee on the first claim for relief under section 548(a)(1)(B).

### Summary of Facts

In March 1998, the Kemmers sold a mountain cabin located on Dinky Creek Road in Shaver Lake, California (the "Property") to the Mundays. The Mundays were licensed real estate agents employed by Coldwell Banker–Shaver Lake Real Estate, Inc. On January 29, 1998, the Kemmers engaged the Mundays' services through Coldwell Banker to sell the Property by executing an Exclusive Authorization and Right to Sell Agreement. The Kemmers' business, Kemmer Agricultural Manufacturing Co., ("Kemmer Ag.") was in serious financial difficulty and headed for bankruptcy. Having personally guaranteed over three million dollars of the Kemmer Ag. debt, the Kemmers were also headed for bankruptcy. A foreclosure against their home was imminent; therefore, they needed the cash proceeds from the Property to fund the homestead exemption in a new home as part of their pre-bankruptcy exemption planning.

The Kemmers desired to complete a "cash only" "fire-sale" of the Property within forty days. On January 31, 1998, Nancy Kemmer wrote a letter to Jean Munday (Plaintiff's exhibit 4) discussing their "strategy" to sell the Property at "such a low price" (the "Fire-sale Letter".) Mrs. Kemmer explained their situation to the Mundays in pertinent part as follows:

Our business has recently had a judgment entered against it in a business matter which had personal guarantees as a part. *We are trying to protect our assets from this judgment if at all possible.* We are currently working on several things which could *protect us.* One would be the sale of the mountain property *and move the cash into an area which would be exempt from this judg-*

*ment.* We have not yet been sued on the [Kemmer Ag.] personal guarantees, however once that happens, *we would have no more than 40 days before a lien could be entered on this mountain property making it unsaleable.*

If we are able to negotiate another avenue to resolve this [Kemmer Ag] problem, then *we would not be forced to "fire-sale" the cabin ....* I still want to sell the cabin, however *if it doesn't become necessary to sell at such a low price, I would like to clean it up and make it more marketable at a higher price.* In other words, if we can "fire-sale" the home during this 40 day period, we will put the cash elsewhere. However, *if after 40 days, we become aware that a "fire-sale" is not needed, then I would like to re-write the listing to a higher price.*

Do you have any good ideas? (Emphasis added)

Based on the Mundays' recommendation, the Property was listed for an "all-cash," "as-is," "quick-sale" price of $79,000. It was the middle of a Winter which the Mundays described in a later Memorandum of Understanding as "... one of the worst Februarys in terms of snow and storms in recent years." (Plaintiff's exhibit 1, page 18) The accumulation of snow at the time prevented the customary and necessary inspections from being conducted. The road to the Property, approximately three-fourths of a mile, was unimproved; and the Property was generally inaccessible to inspectors and potential buyers except by foot and possibly by snowmobile. The Mundays placed the Property on the "Mountain Multiple Listing" service. The Mundays also prepared a promotional flyer with a picture of the Property (Plaintiff's exhibit 6) which advertised, "What an Opportunity!!! Well Below Market Value."

About ten days after first listing the Property for sale, and before receiving any offers for the Property, the Mundays approached the Kemmers and offered to purchase the Property personally. The Mundays requested that the Kemmers set a price at which they would be willing to sell the Property. The Kemmers needed $50,000 cash to fund a new homestead exemption. They also needed $20,819 to pay off the mortgage against the Property plus interest and recording fees. They agreed to sell the Property to the Mundays for a "guaranteed net" price (after escrow costs and commissions) of $72,000. On February 10, 1998, the Mundays executed a Real Estate Purchase Agreement (and Receipt of Deposit) to purchase the Property. In addition to the "guaranteed net" price, the Mundays agreed to pay the closing costs traditionally paid by a seller. The Mundays paid $72,000 for the Property plus $1,324.97 of escrow costs and a "commission" paid back to Coldwell Banker in the amount of $2,160.

The escrow closed and a grant deed to the Mundays was recorded on March 3, 1998. Kemmer Ag. filed bankruptcy under chapter 7 on May 29, 1998 and the Kemmers eventually lost their home to foreclosure. The Kemmers used the proceeds of the Property sale to fund a $100,000 down payment for the purchase of a new residence. On or about May 11, 1998 they executed a "Homestead Declaration" for their new home. The Kemmers filed this bankruptcy petition on August 12, 1998, less than one year after transfer of the Property to the Mundays. The Kemmers claimed a $100,000 homestead exemption in the new residence. The Trustee did not object to the homestead exemption.

On the same day that the escrow closed for the Property, March 3, 1998, the Mundays and the Kemmers entered into a "Memorandum of Understanding" (Plaintiff's exhibit 1, pg. 18) setting forth, *inter alia,* the Mundays' intent to buy the Property below market value and to resell the Property for a profit during the "normal selling season." That Memorandum disclosed in pertinent part:

1. That the *[Kemmers] require a quick sale before the prime selling season* of summer....

4. That the [Mundays], realizing the difficulty in marketing this property, and *having seen the property before the series of storms and realizing its potential,* offered to the [Kemmers] to become principals, as Buyers....

5. That the [Mundays] are buying this property, *under market value in the normal selling season* ... that the [Mundays] intend to do some minor improvements and decorating, and *plan to resell this property for a profit during the summer selling season* ....

6. That once a verbal agreement was reached between [the Mundays and the Kemmers], another party ... communicated to the [Mundays] that he was interested in making an offer.... *The other party was informed that an agreement for sale [between the Mundays and the Kemmers] had been reached.* The [Mundays] offered to take a backup offer, but ... nothing further has been heard from the other party....

7. *That other persons have shown an interest in this property, that they have been told by the [Kemmers] and other agents that it is in escrow [to the Mundays] and that they could always submit a back up offer.* No such backup offers have been received. (Emphasis added)

The Mundays were not able to access the Property by vehicle until June 1998. After the snow melted and the Property once again became accessible, the Mundays spent approximately $12,237 "clean-

ing and repairing" the Property, including extensive water well repairs totaling $6,082 (Defendants' exhibit E.) The Mundays estimate that they spent approximately 388 hours of the their personal time getting the Property ready for sale. In July 1998, the Mundays listed the Property for resale through Coldwell Banker at a price of $129,000. Before Winter came again, they sold the Property for a price of $115,000 to third parties on November 16, 1998.

## ANALYSIS

### *The Trustee's Motion to Amend the Complaint*

The complaint originally filed on January 6, 2000, contains a single cause of action under 11 U.S.C. § 548(a)(1)(B) which deals exclusively with whether the Kemmers were insolvent and received less than "reasonably equivalent value" for the Property. On the morning of the trial, the Trustee made an oral motion to amend the complaint to add a second claim for relief under 11 U.S.C. § 548(a)(1)(A). The new claim would allow the Trustee to avoid the transfer if the Kemmers sold the Property with *actual intent* to hinder, delay, or defraud a creditor. Sections 548(a)(1)(A) & (B) require essentially separate analysis. Section 548(a)(1)(B) is based on the value of the Property and the debtors' solvency. It does not require a showing of fraudulent intent. Section 548(a)(1)(A) is not based on the solvency and value issues, but rather on the subjective intent of the Kemmers. The Trustee offered to prove the new claim from documents already produced in discovery and from the testimony of witnesses already under subpoena to testify, specifically Nancy Kemmer and Jean Munday. The Mundays objected to the proposed amendment on the grounds of undue delay and prejudice. The Mundays had not conducted any discovery on the Kemmers' subjective intent in selling the Property. The court took the Trustee's oral motion under submission.

A party's right to amend a pleading is governed by F.R.B.P 7015 which applies F.R.Civ.P. 15 to adversary proceedings. Rule 15 provides in pertinent part: "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave will be freely given when justice so requires."

Rule 15 allows liberal amendment of pleadings. Federal policy strongly favors determinations on their merits. Thus, the role of pleadings is limited; and leave to amend the pleadings is freely given unless the opposing party makes a showing of undue prejudice, or bad faith or dilatory motive on the part of the moving party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Amendment to the pleadings must be allowed where the objecting party suffers no prejudice as a result of the amendment and would not require the objecting party to undertake an entirely new course of defense or conduct substantial additional discovery. *United States v. Pend Oreille Public Utility Dist. No. 1*, 28 F.3d 1544, 1552–53 (9th Cir.1994)

Moreover, pleadings may be amended to conform to proof at trial. Failure to amend does not affect the outcome because a judgment may be upheld on any theory supported by the facts proved, even if not set forth in the pleadings. See *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 900 (4th Cir.1996).

Applying the liberal standards applicable to Rule 15, the Trustee's motion to amend the complaint to add a new claim under section 548(a)(1)(A) should be granted. The Mundays were not materially prejudiced by the amendment. The Trustee did not offer any new evidence in sup-

port of the new claim. The Mundays were afforded a full opportunity to cross examine the witnesses with regard to the fraudulent intent issues. The Mundays did not request an opportunity to conduct additional discovery or to present new witnesses even though the trial was continued for almost two weeks before its conclusion. The proposed amendment is supported almost exclusively by the Fire-sale Letter. The amendment would have been appropriate if requested after admission of that evidence alone. Trustee's motion to amend the complaint to add a second claim for relief under section 548(a)(1)(A) is therefore granted.

### The Trustee's Claim for Relief under Section 548(a)(1)(A)

Having allowed an amendment of the complaint, the court finds and concludes that the Trustee has failed to sustain his burden of proof to establish that the Kemmers acted with actual intent to hinder, delay or defraud their creditors and therefore rules for the Mundays on that issue.

 Whether the debtors acted with intent to hinder, delay or defraud their creditors is a question of fact. *In re Sholdan,* 217 F.3d 1006, 1010 (8th Cir.2000). While pre-bankruptcy planning of exemptions is permissible, the issue of the debtors' intent in converting an asset from a non-exempt asset to an exempt asset is an important qualification of this otherwise permissive act. A conversion of assets to maximize the amount of exempt property will be disallowed under section 548 if the court finds proof, other than the act of conversion itself, that the debtors made the conversion with the actual intent to hinder, delay or defraud a creditor. See *In re Carey,* 938 F.2d 1073, 1077 (10th Cir.1991).

 Upon review and consideration of the evidence, the court is not persuaded that the Kemmers sold the Property with actual intent to hinder, delay or defraud a creditor. None of the oral testimony suggested that the Kemmers acted with fraudulent intent. The only evidence which could support such a finding was the Fire-sale Letter. However that document, taken as a whole in the context of the testimony and the other evidence, more strongly suggests that the Kemmers were desperately trying to preserve some unencumbered assets for a homestead exemption. The Kemmers listed the Property for sale because it was not exempt as a mountain cabin. Although no litigation had yet been commenced against the Kemmers, they knew that a foreclosure and loss of their home was imminent. Nothing suggests that they were trying to hide the Property from their creditors. The Kemmers testified at trial that they were following the advice of counsel to create a homestead exemption prior to filing bankruptcy. Their testimony was not inconsistent with the statements in the Fire-sale Letter, "... We are trying to protect our assets from this [Kemmer Ag.] judgment if at all possible ... and move cash into an area which would be exempt from this judgment."

The numbers tend to further corroborate the Kemmers' testimony. They had already consulted bankruptcy counsel with their exemption planning options and they knew that they could shift up to $100,000 of equity from other assets into a new home. Mr. Kemmer testified that they already had approximately $49,000–50,000 available from "other sources." They saw the Property as an available source of cash to fully fund the new exemption. The Estimated Seller's Settlement Statement dated March 3, 1998 (Plaintiff's exhibit 7) shows that the Kemmers received the additional cash they needed in the amount of $50,760 from the escrow. The court is not

persuaded that they intended to defraud creditors or that their activities exceeded the bounds of acceptable exemption planning.

 The Trustee argues that the court should not stand by and permit debtors to "dump" property at "fire-sale" prices on the eve of bankruptcy just so the debtors can gain an exemption to the detriment of all of their creditors. However, proper bankruptcy planning allows the conversion of non-exempt property to exempt property on the eve of bankruptcy in the absence of fraud. *Love v. Menick*, 341 F.2d 680, 682–83 (9th Cir.1965). In order to be fraudulent, the intent of the debtors must be to hide assets from their creditors, not to make use of a lawful exemption. *Id.* While Mrs. Kemmer's Fire-sale Letter and the exigent circumstances under which the Property was actually sold to the Mundays are certainly relevant to the "reasonably equivalent value" analysis under section 548(a)(1)(B), they do not establish the requisite fraudulent intent in this case.

### The Trustee's Claim for Relief under Section 548(a)(1)(B)

Under Section 548(a)(1)(B), the Trustee may set aside the Property transfer as constructively fraudulent if the Trustee can prove that the debtors (1) received less than reasonably equivalent value in exchange for the Property and (2) were insolvent on the date of the transfer or became insolvent as a result of the transfer.

 What is "reasonably equivalent value" is not defined by the legislature. That function has been left to the courts. *McCanna v. Burke*, 197 B.R. 333, 338–39 (D.N.M.1996). There is no hard and fast rule in the Ninth Circuit as to what constitutes "reasonably equivalent value." The concept of "reasonable equivalence" is not wholly synonymous with "market value" even though market value is an extremely important factor to be used in the court's analysis. *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir.1990). The transferee's "good faith" is also a relevant factor. *In re Smith*, 24 B.R. 19, 23 (Bankr.W.D.N.C.1982).

 Whether the transfer is for "reasonably equivalent value" in every case is largely a question of fact, to which considerable latitude must be given to the trier of fact. *In re Ozark Restaurant Equip. Co.*, 850 F.2d 342, 344 (8th Cir. 1988). In order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question. *5 Collier on Bankruptcy*, (15th Ed. Revised, 2000), ¶ 548.05[1][b], pg. 548–36.

 Evaluating all of the circumstances surrounding the sale of the Property, the court finds that the Property was not sold for "reasonably equivalent value." The Kemmers were not trying to sell the Property for its "reasonable" value, and they had no incentive to negotiate with the Mundays for a higher and better price. Their intent was to "fire-sale" the Property within forty days. They only needed $50,000 from the Property to fully fund a new homestead exemption. Mrs. Kemmer testified that they estimated what was needed to pay the mortgage and to fund the homestead exemption and then "worked backward" to establish an acceptable selling price. When the Mundays offered to buy the Property and asked the Kemmers to set a price, it was no coincidence that the agreed "net" price, $72,000, approximately equaled the existing mortgage plus $50,000. In their desperation to "protect their assets" from judgment creditors, the Kemmers could not wait for the "normal selling season" or to "clean it up

and make it more marketable at a higher price" as reflected in the above referenced documents.

Conversely, the Mundays saw an opportunity to "make a profit", and they had no incentive to pay any more than the minimum price that the Kemmers needed from the Property. From conversations with Mrs. Kemmer and the Fire-sale Letter, the Mundays were uniquely situated with knowledge of the Kemmers' failing financial situation and need to sell the Property for cash "before the prime selling season." After recommending an "all cash," "as-is," "quick-sale," "below market value" price of $79,000, the Mundays saw an opportunity to personally profit from the circumstances. They only paid $72,000 for the Property. The Memorandum of Understanding reveals that the Mundays were familiar with the Property before the Winter storms made it inaccessible to other potential buyers. They knew they were "buying this property under market value in the normal selling season" and they planned to "resell this property for a profit during the summer selling season." The Mundays only had the Property listing for ten days before *the Mundays approached the Kemmers* about buying the Property. The Memorandum of Understanding suggests that Coldwell Banker continued to list the Property; but when other interested persons inquired about the Property, they were told that it was already in escrow to the Mundays. Barely four months after purchasing the Property, the Mundays listed the Property for resale at a price of $129,000. After spending approximately $12,000 to clean up and repair the Property, the Mundays sold it for $115,000; almost 60% more than they initially paid for it—a net profit of almost 37% after the cleaning and repair costs.

The notion of a transfer for "reasonably equivalent value" implies that the transfer process itself must be "reasonable" and consistent with normal marketing practices. This concept is particularly important when the buyer is also the real estate agent hired by the seller to advise and represent the seller with regard to the sale to make sure that the sale was at "arms-length". Under California law (Business and Professions Code § 10131 *et seq.*) a real estate agent has a fiduciary relationship with his/her client. *In re Briles*, 228 B.R. 462, 467 (Bankr. S.D.Cal.1998). The dealings between a fiduciary and its principal are subject to "rigorous scrutiny." *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). "The essence of the test is whether or not under all the circumstances, the transaction carries the earmarks of an arms length bargain." *id.* at 306–07, 60 S.Ct. 238.

The Mundays argue that the exigent circumstances resulting from the Kemmers' financial situation, the inaccessibility of the Property in the middle of Winter and the risks inherent with the lack if ordinary inspections on the Property are circumstances which justified a substantial discount in the selling price of the Property. Mrs. Munday testified that the Kemmers' "motivation and timing" were factored into her initial recommendation to set the selling price at $79,000. The Mundays' appraiser, Mary King, testified that the "quick-sale" circumstances justified a 25–30% discount below her initial fair market valuation of $100,000. The argument is unpersuasive. Indeed, the concept of "fair market value" may not be applicable in the forced-sale foreclosure context. *BFP v. Resolution Trust Corp.* 511 U.S. 531, 537, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994). However, this was not a forced-sale foreclosure brought about through the lawful exercise of the secured creditor's rights. The circumstances of this transfer

were driven by the Kemmers' subjective understanding of their particular financial situation. Exigent and unreasonable marketing conditions imposed by the sellers do not necessarily make the resulting sales price reasonable. In the court's view, the lack of a motive by either the sellers or the buyers to realize the highest and best price, the Mundays' special relationship to the Kemmers and access to information regarding the Kemmers' financial condition, the lack of time for any real marketing effort by the Mundays, and the fact that the Property was soon resold for a substantial profit, all support findings that the sale was not conducted at arms length and that the Kemmers did not receive reasonably equivalent value for the Property.

### The Debtors Were Insolvent on the Date of the Transfer

"Insolvent" is defined under section 101(32) as, " . . . financial condition such that the sum of [the debtors'] debts is greater than all of [the debtors'] property, at a fair valuation, exclusive of [fraudulent transfers and exempt property]." "Debt" is defined in section 101(12) as "liability on a claim."

The court is persuaded by a preponderance of the evidence that the Kemmers were insolvent in March 1998. The parties stipulated at trial that the Kemmers' bankruptcy schedules accurately reflected their financial condition showing that they were insolvent when the petition was filed in August 1998. Working back to March 3, when the Property was sold, both Mr. and Mrs. Kemmer testified that they had significant personal liability, in excess of their assets, on personal guarantees to Kemmer Ag.'s creditors dating as far back as October 1996. There was no evidence to the contrary. Mrs. Kemmer testified that the assets they owned in March 1998, were essentially the same as reflected in the

bankruptcy schedules, except for some items sold at a garage sale and the mountain cabin. There was some speculation by Mrs. Kemmer that their stock in Kemmer Ag. may have had some value in March 1998. However, the Kemmers valued that stock in their bankruptcy schedules at $0 as of August 1998. Kemmer Ag. filed bankruptcy under chapter 7 on May 29, 1998, less than three months after the Property was sold. The Kemmer Ag. stock was certainly worthless by that time. Mrs. Kemmer testified that the value of the stock did not change between March and November of 1998 which suggests that the stock was virtually worthless when the Property was sold in March 1998. Again, there was no evidence to the contrary. The court therefore finds that the Kemmers were insolvent at the time they sold their Property to the Mundays.

### The Value of the Property Recoverable under Section 550(a)

The Trustee's right of recovery from an avoided fraudulent transfer is prescribed under Bankruptcy Code section 550(a) which states, " . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from— (1) the initial transferee of such transfer . . . ." Here, the Mundays were the initial transferees. However, the Property was resold to third parties prior to commencement of this bankruptcy, so the appropriate measure of recovery from the Mundays would be the value of the Property.

Section 550(a) refers to the "value" of the property for purposes of fixing the Trustee's right of recovery. By contrast, section 548(a)(1)(B) refers to "reasonably equivalent value" for purposes of determining whether the transfer is avoidable in the first place. The term "value" under section 550(a) is not necessarily synonymous with either "reasonably equiva-

lent value" or "fair market value." The question of "reasonably equivalent value" under section 548(a)(1)(B) is measured in light of "all the circumstances surrounding the transfer in question." *5 Collier on Bankruptcy*, (15th Ed. Revised, 2000), ¶ 548.05[1][b], pg. 548–36. The courts have recognized that "reasonably equivalent value" may be significantly different than the appraised "fair market value" depending on the circumstances of the transfer. *BFP v. Resolution Trust Corp., supra.* The Trustee has established that the transfer itself was made for less than some "reasonably equivalent value." However, when the Property is no longer recoverable from any party to the litigation and monetary recovery is the only available remedy, the Trustee's actual measure of recovery is not necessarily tied to either the "reasonably equivalent value" or the "fair market value" standards.

The "fair market value" is a relevant factor and here serves as an appropriate starting point to fix the "value" recoverable under section 550(a). The court finds that the fair market value of the Property was $100,000 at the time of the transfer in March 1998. The court finds unpersuasive the testimony of the Trustee's appraiser, Greg Palmer; that the Property was worth the same in March 1998, before the repairs, as it was worth in November 1998, after the repairs. Mr. Palmer failed to take into account that any repairs, including the water well, might have to be made at the seller's expense prior to close of escrow or that the absence of such repairs might affect the fair market value of the Property. Similarly, the court finds the testimony of the Mundays' appraiser, Mary King, equally unpersuasive. Ms. King did not appraise the Property until December 2000. After starting with an initial valuation of $100,000, Ms. King then estimated a 25–30% discount factor based on the same "exigent" marketing condi-

tions that made the transfer fail to meet the "reasonably equivalent value" test in the first place.

Mrs. Munday testified on direct examination that if she had taken the listing for the Property in July 1998, six months after the actual listing, that she would have recommended a listing price of $105,000. The Mundays actually sold the Property after some "clean up and repairs" and a reasonable marketing effort for $115,000. Mrs. Munday testified that the full $12,000 out of pocket repair and clean-up cost was necessary to close escrow. The Mundays also assert that 388 hours of their personal time added value to the Property. However their personal time was spent on many activities, including shopping for supplies, and in anticipation of making a profit on the resale. The Mundays failed to prove that their personal time had any specific value, that any portion of their personal time was necessary to close escrow or that it added any particular "value" to the Property for purposes of this analysis. Coldwell Banker employee, Roberta Wear, testified that the Mundays personally received a real estate commission of $1,757 upon close of the November 1998 escrow which, in the court's view, substantially compensated the Mundays for the personal time they invested in fixing up and reselling their own property. After deducting the out-of-pocket "clean-up and repair" costs from the ultimate resale price, allowing a $3,000 adjustment for the labor contributed by the Mundays and in light of the other evidence, the court is persuaded that the appropriate fair market value for the Property as of March 3, 1998 was $100,000.

The property interest which the Kemmers actually transferred to the Mundays was encumbered by a mortgage. What the Mundays acquired from the Kemmers was their equity in the Property. At the

close of the March escrow, the sum of $21,100 was paid directly from escrow to the mortgage company, including interest and recording fees, for release of the mortgagee's lien. After deducting the mortgage payoff from the fair market value, the court finds that the equity in the property transferred to the Mundays was $78,900. (In effect, the Mundays only paid $50,900 for that equity—less than 65%.) Had the Trustee sold the Property for "fair market value" in this bankruptcy, the mortgage would still have been paid off directly through escrow. Those funds would not have passed through the estate. Alternatively, the Property would have been sold subject to the mortgage with an corresponding reduction of the fair market selling price. In this case, the appropriate "value" of the Property for purpose of fixing the Trustee's recovery under section 550(a) is therefore measured by the amount of equity transferred to the Mundays—$78,900.

### The Mundays' "Good Faith Transferee" Defense

The Mundays assert by way of affirmative defense that they are entitled to a right of offset against the Trustee's recovery. Under Bankruptcy Code section 548(c) the Mundays assert an offset for the "value" they gave to the Kemmers to purchase the Property. Under section 550(e) the Mundays assert an offset by way of a lien for the increased value as a result of "improvements" made to the Property before it was resold. To qualify for either adjustment, the Mundays have the burden to first establish that they were "good faith transferees."

The Bankruptcy Code does not define a "good faith transferee." However the courts have held that "good faith" requires, *inter alia*, an *arms-length transaction* and the transferee's honest belief in the propriety of the activities in question.

*5 Collier on Bankruptcy*, (15th Ed. Revised 2000) ¶ 548.07[2][a], p. 548–59–584–60.

The court is not persuaded that the Mundays were "good faith transferees" for the same reasons discussed above as to why the transfer was not for "reasonably equivalent value." The property was not transferred in an arms length transaction. The Fire-sale Letter and the Memorandum of Understanding illustrate clearly that the Mundays knew about the economic pressure for a "quick sale." As the Kemmers' real estate agents, they were in a unique position to acquire the Property for "under market value," before there had been a reasonable marketing effort and before the "normal selling season." Accordingly the Mundays' request for an offset of the purchase price under section 548(c) is denied.

The Mundays' request for an offset of their clean-up and repair costs under section 550(e) is also denied. The Mundays were not good faith transferees. Further, the repair costs were incurred after the Kemmer escrow closed in March 1998. The court has already deducted the repair costs from the November 1998 resale price in its calculations to determine the appropriate "fair market value" of the Property before the repairs were made.

### Conclusion

Based on the foregoing, the court finds and concludes that the Kemmers' Property was voluntarily transferred to the Mundays within one year before the date of the filing of this bankruptcy petition, that the Kemmers received less than reasonably equivalent value in exchange for such transfer, and that the Kemmers were insolvent on the date of the transfer. The court further finds and concludes that the Property was not transferred by the Kemmers with actual intent to hinder, delay or

defraud any creditor. The Mundays are not "good faith transferees" within the meaning of the Bankruptcy Code. Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from the defendants, Doug and Jean Munday, jointly and severally, the value of the Kemmers' equity in the Property at the time of the transfer in the amount of $78,900.