# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-20687

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2014

Lyle W. Cayce
Clerk

In the Matter of:  POSITIVE HEALTH MANAGEMENT,

> Debtor

------------------------------

RANDY W. WILLIAMS, Chapter 7 Trustee,

> Appellant

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First National Bank,

> Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and WIENER and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

The Bankruptcy Code allows a trustee to recover fraudulent transfers made by the debtor prior to bankruptcy.  11 U.S.C. § 548(a).  An innocent recipient of such a fraudulent transfer is not without a defense, however.  The Code allows a transferee that takes in good faith to retain what it received from the debtor in a fraudulent transfer "to the extent that such transferee . . . gave value to the debtor in exchange for such transfer."  11 U.S.C. § 548(c).  This

No. 12-20687

appeal from a bankruptcy court decision that allowed the innocent recipient of fraudulent transfers to retain all the funds it received under the affirmative defense in section 548(c) turns on the meaning of "value" in this statute. We have already held that this value must be assessed from the perspective of what the transferee gave up rather than what the debtor received. *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799–802 (5th Cir. 2002). The unresolved question we must now decide is what happens when a transferee gave less value to the debtor than it received. Is the transferee allowed to keep all that it received so long as it gave "reasonably equivalent" value in exchange? Or is netting required so that the transferee keeps only the value that it gave to the Debtor?

## I.

Ronald T. Ziegler was the president and sole shareholder of Positive Health Management, Inc., which operated pain management clinics in Texas. In 2005, First National Bank made a refinance loan to a separate corporate entity owned by Ziegler. The loan was secured by a building in Garland, Texas, which Positive Health used for office space from September 2006 to March 2008. Despite having no direct obligations under the loan, Positive Health made a series of payments to First National totaling $367,681.35. The payments, which began in February 2007 and ended in March 2008, were listed on Positive Health's tax returns as rent. When the payments stopped, First National foreclosed on the Garland property.

After Positive Health filed a bankruptcy petition, trustee Randy Williams brought an adversary proceeding to recover the payments to First National as fraudulent transfers under 11 U.S.C. § 548. The bankruptcy court conducted a three-day trial on the claim, after which it submitted Proposed Findings of Fact and Conclusions of Law.

2

No. 12-20687

The bankruptcy court first addressed whether Williams could prove a constructive fraudulent transfer, which requires that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B). The court found that Positive Health received at least reasonably equivalent value for the $367,681.35 in transfers to First National on two alternative grounds. First, the court cited First National's forbearance from foreclosing on the Garland property, which allowed Positive Health to continue "running its operations and generating cash flow in the millions." Second, the court cited the "reasonable rent" for the office space that the payments enabled Positive Health to continuing using, which the court determined was $253,333.33 based on an appraisal conducted in 2006. Because Positive Health received value at least "reasonably equivalent" to the amount of the transfers, the court held that Williams could not prevail on the constructive fraudulent transfer claim.

Nonetheless, for reasons not seriously challenged in this appeal,[1] the bankruptcy court concluded that Positive Health made the transfers "with actual intent to hinder, delay, or defraud," and therefore that Williams had established actual fraud. 11 U.S.C. § 548(a)(1)(A). The court made this finding pursuant to the multifactor test identified in *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008), and noted Positive Health's deteriorating financial

---

[1] First National argues that "the payments from Positive Health to First National could not constitute fraudulent transfers at all." But it does not challenge the court's finding of fraudulent transfer beyond an unsupported assertion that Williams offered "no proof whatsoever." We therefore conclude that any challenge to the fraudulent transfer finding is waived. *See Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 260 n.9 (5th Cir. 1995) ("[T]he failure to provide any legal or factual analysis of an issue results in waiver of that issue."). In any event, the reasons cited by the bankruptcy court were sufficient to support its finding of fraud.

condition and the fact that it faced lawsuits and judgments around the time of the transfers.

The bankruptcy court then analyzed whether First National could establish the affirmative defense that it took the payments in good faith and gave value in return. 11 U.S.C. § 548(c). Relying on its discussion of "reasonably equivalent value" under the constructive fraudulent transfer analysis, the court determined that First National "gave value in exchange for the transfers" and acted in good faith. It therefore found that First National was entitled to the defense and could keep the funds.

After the district court adopted the bankruptcy court's proposed order, Williams filed a motion to amend the judgment, arguing that the affirmative defense had not been adequately pleaded and that the testimony concerning the market value of the rent was unreliable. The district court referred the motion back to the bankruptcy court, which held an additional hearing on First National's section 548(c) affirmative defense. At the hearing, Williams called his own expert witness, who testified that the testimony of First National's witness was not reliable for the purposes of determining rent in 2007 and 2008. The bankruptcy court noted in response that Williams "offered no evidence on the rental value of the Garland Property," so its initial finding of market rent was uncontroverted. The district court again adopted the bankruptcy court's recommendation, noting that First National "'gave value' to the debtor beyond the rental value of the property." This appeal followed.[2]

---

[2] The Federal Deposit Insurance Corporation was appointed receiver of First National in September 2013, and was substituted as the defendant in this appeal. For clarity, and because First National was the defendant at the time of briefing and the trial court proceedings, this opinion will refer to the defendant as First National.

No. 12-20687

## II.

"In reviewing the rulings of the bankruptcy court on direct appeal and the district court sitting in bankruptcy, we review findings of fact for clear error and conclusions of law *de novo.*  We review mixed questions of law and fact *de novo.*"  *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 519 (5th Cir. 2014) (per curiam) (internal citations omitted); *see also Hannover*, 310 F.3d at 799–800.  A bankruptcy court's valuation "is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts."  *Hannover*, 310 F.3d at 801 (internal quotation marks omitted).  However, "we review *de novo* the methodology employed by the bankruptcy court in assigning values to the property transferred and the consideration received."  *Id.* (internal quotation marks and citation omitted).

## III.

Under 11 U.S.C. § 548(a), the trustee of a bankruptcy estate may avoid certain transfers made by the debtor before bankruptcy proceedings if the transfer was made with actual or constructive fraudulent intent.  But even when a debtor has made a fraudulent transfer under that provision, an innocent recipient of that transfer is able to retain what it received if the conditions set out in section 548(c) are met:

> [A] transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

The provision is "perfectly complementary" with section 548(a), which allows trustees to claw back fraudulent transfers.  *Hannover*, 310 F.3d at 802.  Section 548(a) "affords creditors a remedy for the debtor's fraudulence or, as the case

5

might be, mere improvidence," whereas section 548(c) "protects the transferee from his unfortunate selection of business partners." *Id.*

To establish its entitlement to the section 548(c) defense, a transferee must prove that it "provided value in good faith" for the transfer. *In re Am. Hous. Found.*, 544 F. App'x 516, 520 (5th Cir. 2013) (per curiam). A transferee provides value when it receives the transfer in question in exchange for "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). Williams does not dispute that First National acted in good faith when it accepted funds from Positive Health as payments on a loan made to another Ziegler entity, but contends that First National failed to prove that it provided value. He attacks both grounds upon which the bankruptcy court found value. First, he contends that finding value based on the benefit to Positive Health of its extended ability to use the Garland property did not assess value from the perspective of First National as transferee. Second, Williams questions the evidence presented on the reasonable rental value of the property: he agrees that the court properly evaluated this "value" from the transferee's perspective, but he challenges its reliability.

This court's decision in *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796 (5th Cir. 2002), clarified the meaning of "value" under section 548(c). In that case, prior to the bankruptcy proceedings, Sam J. Recile was found in violation of the securities laws for operating a Ponzi scheme. *Id.* at 798, 802. The trustee brought an action to recover funds from Jimmy Swaggart Ministries, which received them from Recile's enterprise in exchange for short-term call options for the purchase of a tract of land. *Id.* at 798–99. In response, Jimmy Swaggart Ministries asserted the section 548(c) defense. *Id.* at 799. The trustee argued that the options were valueless because the fraudulent nature of Recile's enterprise meant that it lacked the

resources to pay anything close to the land's $11.25 million purchase price set forth in the option agreement, and thus that Jimmy Swaggart Ministries did not "give value" in exchange for the transfers it received. *Id.* at 801–02.

This court rejected that argument, holding that "value" under section 548(c) is measured from the transferee's perspective, and therefore that whether the options had any actual value to Recile's enterprise was irrelevant:

> Instead of inquiring into the possibility and extent of the debtor's loss, [section 548(c)] provides a means by which the unwitting trading partner can protect himself. Received property can be retained "to the extent" that the "transferee . . . gave value to the debtor." The provision looks at value from the perspective of the transferee: How much did the transferee "give"? The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain.

*Id.* at 802. The court thus found that the option to buy the property was "a very valuable asset" from the perspective of Jimmy Swaggart Ministries, the transferee, because it tied up its ability to sell to other willing buyers. *Id.* at 803–04.

In measuring "value" under section 548(c), therefore, this court looks not to "the transferor's gain," but rather to the value that the transferee gave up as its side of the bargain.[3] In this case, First National as transferee argues

---

[3] In cases brought under state fraudulent transfer law, we have focused instead on the value of the consideration to the transferor. In *Janvey v. Brown*, --- F.3d ----, 2014 WL 4627972, at *7–8 (5th Cir. Sept. 11, 2014), for example, we held that the trustee of a bankrupt Ponzi scheme could claw back interest payments to innocent investors. *Janvey* rejected the investor-defendants' argument that the debtor's use of their money established that they gave value in exchange for the interest payments. *Id.* at *7. The court noted that "[t]he primary consideration in analyzing the exchange for value for any transfer is the degree to which the transferor's net worth is preserved" because "creditors are not . . . defrauded if all that happens is the exchange of an existing asset of the debtor for a different asset of equal value." *Id.* at *8 (alterations in original) (quoting *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006), and *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995)) Because the Ponzi scheme's financial condition was only worsened by the interest payments, the investors had not given value in exchange for the interest payments. *Id.* As the *Hannover* decision makes

that the estate cannot recover the payments because the value of First National's forbearance—which the bankruptcy court noted was the potential for Positive Health to generate cash flow from ongoing operations that ultimately earned the company over $4 million in revenue—exceeds the $367,681.35 that First National received. But just as it was irrelevant in *Hannover* whether Recile's operation received any real value from options it could not exercise, it is irrelevant that Positive Health received outsized benefits from First National's forbearance. Both examples fail to follow *Hannover*'s instruction that value given up should be measured from the transferee's perspective—instead, they measure the value of the transferee's consideration as the transferor would.[4]

The alternative form of value found by the bankruptcy court, market rent, does analyze value from the correct perspective. Just as tying up land was costly to the transferee in *Hannover*, allowing Positive Health to stay in the Garland property was costly to First National. By giving up the chance to foreclose and find a new tenant, First National incurred an opportunity cost in the form of foregone market rent.[5]

Because First National received the loan payments in lieu of rent it could have otherwise earned, it gave value within the meaning of section 548(c).

---

clear, however, we focus on the value of the exchange to the transferee for the purposes of section 548(c) of the federal Bankruptcy Code.

[4] In fact, the bankruptcy court's finding of value under section 548(c) simply incorporated its finding of value under section 548(a)(1)(B). Under the latter provision, unlike the former, value is properly determined from the transferor's perspective. *See Butler Aviation Int'l Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993) ("[T]he recognized test is whether the investment conferred an economic benefit on the debtor.").

[5] Contrary to First National's argument, the two valuations offered by the bankruptcy court are not two independent forms of value that the bank gave to Positive Health. Rather, they are two different ways of analyzing the value of First National's forbearance. Because only the rental value of the property measures value from First National's own perspective, it is the appropriate measure in this case.

No. 12-20687

Although the rent measure properly assesses value from the standpoint of the transferee, Williams contends that the bankruptcy court erroneously calculated the market rent because it relied on an appraisal of the Garland building from January 2006 when the transfers occurred in 2007 and 2008. It is true that "for purposes of § 548 the value of an investment . . . is to be determined at the time of purchase." *Hannover*, 310 F.3d at 802. The bankruptcy court, however, *did* determine that "the reasonable rental rate from September 2006 to March 2008"—which includes the entire period in question—"was $253,333.33." It was not clearly erroneous based on the record in this case to use the January 2006 appraisal—the only evidence offered for market value—to assess rental value for the 27 months that followed the appraisal. To hold otherwise would present significant practical problems for trial judges who often must make findings of fact based on imperfect evidence. There is no reason to question the bankruptcy court's finding, particularly given the "considerable latitude" we must give it in this situation. *See Hannover*, 310 F.3d at 801. We therefore affirm the finding that First National was entitled to the section 548(c) defense because it acted in good faith and provided value in return.

## IV.

This brings us to the "netting" question identified at the outset. Williams contends that even if the affirmative defense applies, section 548(c) requires this court to reduce the value of the fraudulent transfers ($367,681.35) by the value of the market rent ($253,333.33), and to award the estate the $114,348.02 difference. This argument is based on the text of section 548(c), which provides that if a transferee shows it has taken in good faith and for value, then it "may retain any interest transferred . . . *to the extent* that such transferee . . . gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c) (emphasis added). The bankruptcy court took

a looser approach, finding (in the alternative) that First National was entitled to keep the entirety of the transfers because the rental value was "reasonably equivalent" to the amount of the transfer.  Although the district court appeared to recognize that netting may be appropriate in some situations, emphasizing section 548(c)'s "to the extent" language, it found that First National "'gave value' to the debtor beyond the rental value of the property," and therefore that netting was not necessary in this case.  It reached this conclusion based on the value that Positive Health received from continuing operations in the Garland office, an assessment that we have already concluded is at odds with *Hannover*.

First National rejects what it terms a "rigid 'netting' approach," arguing instead that a transferee is allowed to keep all of the fraudulent transfers when it establishes the section 548(c) defense so long as the values exchanged are "reasonably equivalent."  The term "reasonably equivalent value" appears in section 548(a)(1)(B)(i) as a factor in the determination of constructive fraudulent transfer.  It does not appear in section 548(c).  Nonetheless, the bankruptcy court equated the two terms, citing *Hannover*: "In analyzing whether a transferee gave value, the Fifth Circuit adopted the analysis of reasonably equivalent value under § 548."  Although a number of bankruptcy courts have similarly cited *Hannover* for the proposition that "value" under section 548(c) means "reasonably equivalent value,"[6] this reading is mistaken. *Hannover* only held that "the standard for *appellate review* of trial court determinations of 'value' under § 548(c)" is the same as "this court's approach to the review of trial court determinations of 'reasonably equivalent value'" under section 548(a).  310 F.3d at 801 (emphasis added).  Nonetheless, even some courts that do not rely on this "standard of review" language from

---

[6] *See Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D.N.J. 2006); *Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004).

*Hannover* have held that section 548(c) "value" means "reasonably equivalent value." *See, e.g., Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001).

This is not, however, the only conclusion reached by courts that have considered the issue. Others have treated "value" and "reasonably equivalent value" as having distinct meanings. *See Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 223 (Bankr. D. Nev. 2007); *cf. Salven v. Munday (In re Kemmer)*, 265 B.R. 224, 234–35 (Bankr. E.D. Cal. 2001) (noting, in the context of 11 U.S.C. § 550(a), which sets out a trustee's right of recovery from an avoided fraudulent transfer, that "value" "is not necessarily synonymous with either 'reasonably equivalent value' [under section 548(a)(1)(B)] or 'fair market value'"). The Collier treatise also takes the view that "value" in section 548(c) is different than "reasonably equivalent value." In comparing section 548(c) with the corresponding provision of the Uniform Fraudulent Transfer Act, the treatise provides a helpful comparison:

> [A]ssume that a debtor [sold his brother a car worth $12,000 for $11,000] to put the car out of the reach of the debtor's creditors, but the brother did not know of the fraud or of his brother's financial condition. . . . Under [section 548(c)], the transaction is . . . set aside, but the brother has a lien on the car to the extent of $11,000; under state law, assuming that $11,000 is reasonably equivalent value for a $12,000 car, the brother has a complete defense to avoidance.

5 COLLIER ON BANKRUPTCY ¶ 548.09[5] (16th ed. 2014) (quoting *Nat'l Audit Def. Network*, 367 B.R. at 233).

We agree with Collier's reading of section 548(c). It is unlikely that the drafters of the Bankruptcy Code intended "value" under section 548(c) to mean "reasonably equivalent value" when the latter term is explicitly used in another subsection of the same statute (section 548(a)'s provision for

constructive fraudulent transfers).  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").  And the exclusion of these words is particularly telling in light of the Uniform Fraudulent Transfer Act's use of "reasonably equivalent value" in its corresponding affirmative defense to avoidance of a fraudulent transfer.[7]  *See* 5 COLLIER, *supra*, ¶ 548.09[5] (comparing the Bankruptcy Code and UFTA, and noting that only the latter gives the transferee "a *complete* defense" if it "gave reasonably equivalent value for the exchange" (emphasis added)); *In re Nat'l Audit Def. Network*, 367 B.R. at 223 (same); Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 BANKR. DEV. J. 55, 111 (1991) (noting that when a transferee gives "reasonably equivalent value" that is less than actual value, the transferee "is afforded additional protection under Section 8(a) of the UFTA beyond that provided under Section 548(c) of the Code").

Apart from the need to give different meanings to different terms used in the same statute, even viewed on its own the text of section 548(c) supports the netting approach.  The last clause of the statute, beginning with "to the extent," makes clear that a transferee is entitled to keep only the amount of a fraudulent transfer that equals the amount it gave up in exchange.  *See Hannover*, 310 F.3d at 802 (noting that "[r]eceived property can be retained 'to the extent' that the 'transferee . . . gave value to the debtor'").  And if, as the bankruptcy court implicitly found, netting is not appropriate because "value" means "reasonably equivalent value," this reads the "to the extent" clause out of section 548(c) as establishing reasonably equivalent value under the first

---

[7] *See* UNIF. FRAUDULENT TRANSFER ACT § 8(a) ("A transfer or obligation is not voidable . . . against a person who took in good faith and for a reasonably equivalent value.").

clause would be all that a transferee needs to show. *See* 11 U.S.C. § 548(c) ("[A] transferee . . . that takes for *value* and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave *value*." (emphasis added)).

First National argues that a "rigid netting approach" is not appropriate because "for more than four hundred years, the good faith and 'value' defense merely required 'good consideration' rather than some precise mathematical equivalence of value." But it is *because* transferees who merely give "good consideration" in exchange for fraudulent transfers are entitled to the defense that netting is necessary. Consideration need not be "reasonably equivalent" to be valid. *See Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir. 1995) ("[O]rdinarily a court will not even permit inquiry into the adequacy of the consideration for a promise or a transfer."). And because consideration may be disproportionately small, to hold that a transferee who merely gives "good consideration" in exchange for a fraudulent transfer may keep the entire amount would allow it to benefit at the expense of the debtor's creditors based on the fortuity that it received a fraudulent transfer.[8]

Courts have thus netted the amounts received in a fraudulent transfer against the value given to the debtor. *See, e.g., Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 243 (10th Cir. 1993) ("[T]he Bank was the transferee of a fraudulent transfer from the Debtor. As such, it became liable to the bankruptcy estate for the amount of the transfer less any value it extended to the Debtor in exchange for that transfer."); *In re Telesphere Comm'ns, Inc.,* 179 B.R. 544, 559 (Bankr. N.D. Ill. 1994) (for the purposes of

---

[8] In trying to defend the equity of retaining the full transfer, First National claims that it was "entitled" to repayment of the loan it made. That is true, but beside the point. Positive Health's other creditors were also entitled to compensation—that is what makes them creditors—and allowing First National to keep the full amount of the transfers reduces their potential recovery.

13

comparing a settlement to the likely outcome of litigation, netting a $92.7 million fraudulent transfer with the $38.9 million value given by the transferee). The netting issue often arises in Ponzi scheme cases. The trustee of a bankrupt Ponzi scheme typically files fraudulent transfer claims against "net winner" investors to claw back profits they have received. The "general rule" is that while transfers to innocent investors are fraudulent, the "defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."[9] *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011); *see also Janvey*, 2014 WL 4627972, at *6–8; *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Scholes*, 56 F.3d at 757–58.

The language of the Bankruptcy Code and the policies it embodies therefore lead us to the following conclusion: A good faith transferee is entitled to the protections of section 548(c) when it gives *any* value in return, but only to the extent of that value. When a transferee receives a fraudulent transfer the value of which exceeds the consideration it gave up in return, section 548(c) requires netting.

We recognize that not all cases will lend themselves to valuation at a precise dollar amount, such as the rental value determined by the bankruptcy court in this case. But this presents less of a problem than First National suggests. Many section 548 transfers to which the good faith defense applies

---

[9] The defrauded investor will be found to have given value to the enterprise in the form of the surrender of her fraud claim against the debtor. *Janvey*, 2014 WL 4627972, at *8 ("[T]he principal payments were payments of an antecedent debt, namely fraud claims that the investor-defendants have as victims of the Stanford Ponzi scheme."). Anything above that (or in some cases, above the principal plus interest payments, *see In re Carrozzella & Richardson*, 286 B.R. 480, 492 (D. Conn. 2002)), "exceed[s] the scope of the investors' fraud claim and may be subject to recovery by a plan trustee." *Perkins*, 661 F.3d at 627.

involve the purchase of an asset at its fair market price.[10]  This is the reason *Hannover* did not present the netting issue; there was no reason to doubt that the option to purchase the land was acquired at a market price that accurately reflected the value of that option.  But in more unusual transfers, such as the one in this case and as in the Ponzi context, dollar-for-dollar netting is both practicable and important in balancing the interests of creditors with the interests of transferees.  Bankruptcy courts may simply continue applying the tools they use to determine the value of assets in many contexts to determine value under section 548(c).

We therefore hold that Williams, as trustee of the bankruptcy estate, is entitled to recover the $114,348.02 difference between the payments First National received and the value it gave in return.

*　　*　　*

For these reasons, we AFFIRM the district court's finding of fraudulent transfer under section 548(a)(1)(A) to the extent First National challenges it on appeal.  We also AFFIRM the district court's conclusion that First National is entitled to the section 548(c) defense, but REVERSE its take-nothing judgment in favor of First National.  Instead, judgment is RENDERED in favor of Williams in the amount of $114,348.02.

---

[10] When there is a vast imbalance in the values exchanged that would be apparent to the transferee, it may be difficult to establish the good faith requirement.

15