In the Matter of John Douglas
GALBREATH, Debtor.

James B. Wessinger, III,
Trustee, Plaintiff,

v.

Joel Spivey, Ronnie Spivey, Douglas Asphalt Company, Jean S. Galbreath, Richard A. Edwards, and Alicia G. Edwards, Defendants.

Bankruptcy No. 99–60517.
Adversary No. 00–6017.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

March 14, 2002.

W. Brooks Stillwell, III, William E. Dillard, III, Savannah, GA, for Debtor.

Kathleen Horne, Savannah, GA, Melinda Marbes, Atlanta, GA, for Defendant/Respondent.

## MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Debtor John Douglas Galbreath's ("Galbreath") involuntary Chapter 7 case was filed on June 28, 1999, by three creditors [1] of Galbreath. On that same date, these creditors also filed a Chapter 7 case against Galbreath Clearing and Grading, Inc. ("GCG"), a closely held corporation of which Galbreath was the sole shareholder. Neither Galbreath nor GCG contested the filings, and James B. Wessinger ("Trustee") was appointed as the Chapter 7 Trustee for both cases. On July 26, 1999, the Court entered an Order for Relief adjudicating Galbreath bankrupt.

Trustee seeks to set aside a promissory note executed by Galbreath on August 20, 1998 ("the 1998 Note") in the principal amount of $1.5 million in favor of Defendant Douglas Asphalt Company ("DAC"). Trustee also seeks to set aside security deeds granted by Galbreath ("the Property Transfers") pledging his interests in real estate located on Hutchinson Island, Georgia, a twenty-five acre tract in Chatham County, Georgia, and a farm in Bulloch County, Georgia, (collectively, "the Three Parcels") as collateral for the 1998 Note. Both transactions occurred within one year of the Order for Relief. Trustee seeks to set aside both the 1998 Note and the Property Transfers as constructively fraudulent pursuant to 11 U.S.C. § 548,[2] which pro-

---

1. The Coastal Bank, Industrial Tractor Company, Inc., and Sunbelt Rentals, Inc. filed the involuntary petition.

2. Trustee's Complaint sets forth counts for both constructive and actual fraud. In order to simplify and shorten the length of court proceedings, and upon the suggestion of the parties that resolution of this portion of the

vides generally that a trustee may avoid any transfer or obligation made or incurred within one year of the petition date if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation and ... was insolvent ... or became insolvent as a result of such transfer or obligation." § 548(a)(1)(B).

Trustee contends that prior to August 20, 1998, Galbreath was solvent and not personally obligated to DAC. He asserts that when Galbreath signed the 1998 Note and executed the Property Transfers, he did not receive reasonably equivalent value in that he received no new money in any amount from Defendant on that date and that he personally had no pre-existing obligation to Defendant in any amount. Trustee also asserts that incurring the obligation rendered Galbreath insolvent and that Galbreath remained insolvent through November 24, 1998, the date on which the Property Transfers were perfected.

DAC contends, however, that the 1998 Note served simply to memorialize Galbreath's pre-existing obligation to DAC, which arose by virtue of monetary advances made by DAC to GCG prior to the one-year period preceding the filing, repayment for which Galbreath allegedly obligated himself, orally. DAC further contends that trustee failed to establish Galbreath's insolvency and failed to prove that the received less than reasonably equivalent value in the transactions.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H), in which the Court has jurisdiction pursuant to 28 U.S.C. § 151 and the standing order of the District Court for the Southern District of Georgia pursuant to § 157(a). After trial on January 4 and 5, 2002, and the consid-

eration of applicable authorities, I make the following Findings of Fact and Conclusions of Law, in accordance with Federal Rule of Bankruptcy Procedure 7052.

### FINDINGS OF FACT

The parties entered into a lengthy stipulation of material facts which are not in dispute which are incorporated herein by reference (hereinafter referred to as "Stip. ____").

#### a. The Writings

In February and July of 1995 DAC as contractor hired GCG as subcontractor on two projects: Highway 341 in Glynn County, Georgia, and the Pooler Bypass in Chatham County, Georgia. (Ex. P–64, P–65). The Debtor, John Douglas Galbreath, was not a personal signatory to either contract, but his wholly owned corporation, GCG, was the subcontractor obligated to perform. Each contract provided in paragraph 19 that the contractor, DAC, may, at its option, pay outstanding and unpaid bills of GCG and deduct any such amounts advanced from future contract payments which became payable to GCG. Paragraph 41 of each contract contained a "merger clause" providing that no modification of the contract would be valid except in written form consented to by both parties. No written modification of either contract has been produced.

Pursuant to the terms of DAC's contract for the road construction projects with the Georgia Department of Transportation ("DOT"), DAC was obligated to ensure that all bills incurred by DAC's subcontractors were paid in full. The contract provided that if DAC's subcontractors failed to pay, DAC was obligated to do so.

---

case might expedite resolution of the remainder, the Court bifurcated the constructive fraud and actual fraud allegations. In this

trial, the Court's consideration was limited to evidence with respect to issues of constructive fraud.

(Tr. 72–73). Beginning on February 23, 1996, and continuing through November 30, 1998, DAC made a series of payments and advances to or for the benefit of GCG pursuant to the authority contained in the subcontracts and those advances are shown on DAC's general ledger (Stip. 16, 17). From the date of the first advance on February 23, 1996, DAC advanced over $8 million to GCG and applied credits of over $6 million, leaving a balance due on the advances on November 30, 1998, of $2,078,103.50 (Stip. 23, 22). Galbreath personally received none of the advances; rather, all were made to or for the benefit of GCG (Stip. 24, 25).

On April 12, 1996, Galbreath and his company (denominated as "Galbreath, Inc.," but stipulated by the parties to have been a trade name for GCG) executed a promissory note payable to DAC in the amount of $290,250.00 ("the 1996 Note") (Ex. P–7). That note contained no provision for future advances. Instead, it provided a schedule of payments which would retire the note by July 31, 1996. The note specifically provided that DAC "shall withhold" a total of $290,250.00 from "all payments" otherwise due to GCG arising out of GCG's performance of the Pooler Bypass and Highway 341 subcontracts. DAC received payments totaling $295,000.00 from those projects on May 14 and May 29, 1996 (Ex. P–20; D–17). In fact, between April 12, 1996, and July 31, 1996, DAC applied total credits against its advances to GCG of $640,000.00 (Stip. 29). Following the execution of the $290,000.00 note, DAC acknowledges that it set off $640,000.00 in money received from the Georgia DOT on the two subcontracts in question against the outstanding obligations of GCG prior to July 31, 1996, as evidenced in Exhibit P–20. DAC's general ledger, however, shows that additional advances were made between April 12 and July 1996. On the general ledger, DAC did not differentiate between the note balance of $290,250.00 and other advances which were made pursuant to the DOT subcontract. As a result, the general ledger shows that the total debt was not paid in full but was reduced to approximately $81,466.86 as of December 31, 1996 (Ex. P–20).[3]

Spivey testified that DAC's intent was for the $290,000.00 note to work similar to a line of credit, providing written evidence of Galbreath and GCG's indebtedness as to future advances. However, as previously noted, the note itself provided for no future advances, provided for a fixed repayment schedule, and provided that the source of repayment would be from funds otherwise payable to GCG on its subcontract with DAC.

The $290,000 note was secured by a mortgage on the Debtor's 76.53 acre parcel in Chatham County and a Conditional Assignment of his 25.61 acre borrow pit in Chatham County (Stip. 30). DAC later executed a quit claim deed to Galbreath reconveying the 76 acre tract. The deed recited that the "purpose of the deed was to cancel a [prior] deed to secure debt" and that "the debt for which said deed has been given has been paid in full." (Stip. 31).

---

**3.** According to the DAC controller's testimony, on the date the $290,000.00 note was executed there remained an open account balance of $50,000.00. As credits were applied to the account, he applied receipts to the open account balances first, and only when they were "zeroed out" did any excess credit go to reduce the note. When asked to explain why the credits were treated in this fashion, he alluded to his company's practices which dictated that monies received be applied in that manner. However, the note requirements as referenced above required different handling.

DAC's willingness to make these substantial advances to GCG was driven by multiple motivations. First, DAC needed to get the work completed, and it became a choice of keeping GCG in business through the making of advances, or taking over the job directly, or finding a new subcontractor. Second, DAC trusted Galbreath's ability to turn the company's fortunes around and pay off all the obligations when better weather made it foreseeable that Galbreath could return to profitability. Finally, it was to DAC's benefit to make the advances in order to satisfy DAC's obligations to the Georgia DOT to insure timely payment of all bills. Spivey acknowledged that he never made additional advances conditional on the execution of the August 1998 Note and the property transfers and that he never "threatened" to shut GCG down if Galbreath failed to personally guarantee the debt. (Tr.89–90).

Because of inclement weather, GCG was unable to generate sufficient revenue to prevent the amount of net advances it owed DAC from increasing substantially in size during calendar year 1997 and the early part of 1998. By no later than April 1998 the net amount owed DAC from GCG was over $1.3 million (Ex. P–20). At this point, apparently as a result of discussions between Joel Spivey and Galbreath, an agreement was reached for the execution of a formal promissory note to evidence this indebtedness of GCG to DAC and to collateralize the obligation with unencumbered assets or assets in which there was some equity. Galbreath agreed to execute the note, both personally and as president of GCG, and to convey property which he owned personally as collateral security. Although documents were drafted and circulated, the written instrument was not executed until August 1998 after another creditor, The Coastal Bank, declared Galbreath's debt to Coastal to be in default. (Tr.231–32).

On August 20, 1998, Galbreath, GCG, and other parties executed a $1.5 million note in favor of DAC (Ex. P–15). As collateral security, Galbreath personally conveyed to DAC a security interest in the 25 acre parcel, a 143.4 acre farm in Bulloch County, Georgia, and his one-third interest in 46.32 acres on Hutchinson Island, Georgia, which he owned with Joel and Ronnie Spivey, principals of DAC (Ex. P–17, P–18, P–19).[4] The security deeds were filed for record on November 24, 1998, in the offices of the appropriate Superior Court Clerks.

### b. The Oral Agreement(s)

DAC contends that when Galbreath personally signed the $290,000.00 note and the $1.5 million note, he did not incur a new obligation, but that the promissory notes reflected a previous obligation which he had personally undertaken to be responsible to DAC for any and all corporate obligations of GCG. This alleged prior agreement was entirely oral and is acknowledged not to have been the subject of any contemporaneous writing. The only witnesses to the alleged oral obligation of Galbreath to DAC are Galbreath himself and Joel Spivey, president and major shareholder of DAC.[5]

---

4. Galbreath owned a one-third undivided interest in the 46 acre tract on Hutchinson Island, Georgia, and signed a promissory note along with the Spiveys, his co-owners, in favor of SunTrust Bank in the principal amount of $1.8 million.

5. Cal Purvis the, DAC outside independent CPA, performed an audit during 1997. His notes show advances at the end of the fiscal year 1997 to GCG to be $366,000.00, and his notes reflect that Galbreath was personally liable. These notes were made no later than February 1998 and reflect Galbreath's acknowledgment of personal liability, prior to

Spivey testified that Galbreath personally guaranteed "all along the way" (Tr. 74) that he would pay DAC if GCG did not satisfy its debt to DAC. He could not recall the first time such a conversation took place but stated that it was repeated numerous times over the years that the parties dealt with each other. Spivey was unsure whether the commitment occurred before the time the first advance pursuant to the subcontract occurred (Tr. 79), but was quite certain that that guarantee was made by Galbreath prior to the execution of the $290,000.00 note in February 1996. The terms were not detailed, but according to Spivey, Galbreath promised to "put up" anything he owned in order to make certain that DAC was paid by the company or by him (Tr. 84). No specific collateral was promised. Rather, it was a generic commitment to pledge his property, if necessary to ensure repayment. Spivey understood that Galbreath promised that he would make his payment secondary to any obligation of GCG (Tr. 81).

Galbreath acknowledges the agreement in essentially the same terms. In his mind, the company borrowed the money and he would pay the debt if the company failed. (Tr. 183, 198, 219–22). The only specific term was that he would be responsible for GCG's debt. No limitation was placed on his obligation. GCG remained liable for the advances at all times, but he committed himself personally, and his assets, to the repayment if the company was unable to do so.

On August 4, 1998, The Coastal Bank sent a demand letter to GCG declaring default and accelerating its obligation. (Tr. 231). Debtor's execution of the $1.5 million note, the conveyance of the security, and the recording of all the relevant

the date the $1.5 million note was executed in August, and are partially corroborative of Gal-

documents occurred soon thereafter, on August 20.

Spivey testified that the $1.5 million note contained terms which were the same as the oral agreement with Galbreath. However, the note provided that advances would be limited to $1.5 million. (Ex. P–15, p. 2). At the time that the note was executed, GCG was actually obligated in an amount exceeding $1.5 million. As of August 1998 the balance due to DAC was $1.784 million, and by November 1998, the balance exceeded $2.0 million (Stip.22). Spivey acknowledged that the balance owed by GCG to DAC never dipped below the $1.5 million provided for in the note, but contends that the oral commitment by Galbreath was to be personally responsible for all debts, notwithstanding the fact that the note was limited to $1.5 million. No written modification was ever entered into with regard to the $1.5 million note, and all advances which exceeded $1.5 million were based solely on the original subcontracts and the authority contained therein. No new consideration was given Galbreath on August 20 in exchange for the 1998 Note or on November 24 in exchange for the deeds to secure debt on the various parcels of property.

Galbreath acknowledged that his personal obligations to all creditors were higher in 1998 than in 1997 and were higher in August 1998 than in January 1998. Even excluding the obligation to DAC, he acknowledges that his personal liabilities were in fact higher in late 1998 than at the beginning.

DAC proffered evidence that the pre-1998 oral obligation of Galbreath was established through testimony and was corroborated by the notion that such an

breath's and Spivey's testimony.

arrangement is "standard" in the road construction industry. Specifically, notwithstanding the corporate identities under which companies customarily operate, DAC asserts that contractors expect the individuals who own small companies to be personally liable for the corporate obligations. Spivey testified generally to the existence of such an industry standard. Rann Folsom concurred. He testified that DAC was a subcontractor of his company on one occasion six to seven years ago and that his company owed DAC a substantial amount of money. When his company was unable to pay, he testified that he felt personally responsible and told DAC so. He stated that it was an industry "standard" to treat companies that operated "within the trade" in this manner. However, notwithstanding the fact that his contract was entered into no later than 1995 and completed no later than 1996, neither Folsom Heavy Construction Company, of which he was the sole shareholder, nor he, personally, paid DAC at the completion of that job. Rather, in 1997 a note was executed by Folsom Heavy Construction only (Ex. D–43) for $180,000.00 which was to have been repaid one year later. Neither Folsom nor the company repaid that note at the end of the year; instead, the company repaid the note a year and a half later, or six months after it went into default by its terms. Folsom provided none of the funds personally for the repayment of that obligation. When cross-examined as to whether he might ever assert a legal defense based on lack of personal liability for a corporate obligation, he conceded that, depending on who the plaintiff was, he might in fact assert such a defense. Thus, despite his words which tended to support the fanciful notion that there is such an industry "standard," his conduct belied one. Indeed, when the time came

for his company to sign a note in favor of DAC, Folsom's personal signature was notably absent, and when the debt was paid, his company provided the funds.

I construe Folsom's testimony to amount to nothing more than a pragmatic realization that if he did not insure the repayment of the obligations which his closely-held company incurred, his ability to do business with regular business associates in the future would be seriously damaged, if not destroyed. Thus, Folsom, like Galbreath, had incentive to pay if his company failed to do so. However, I find that there is no industry standard which makes controlling shareholders legally liable for repayment of corporate obligations. Absent piercing of the corporate veil or the issuance of a written guaranty, such a loose standard would eviscerate much long-established and well-settled commercial law.

c. **Galbreath's and GCG's Financial Condition**

GCG's audited financial statements dated between May 31, 1995, and May 31, 1997, showed a negative net worth for every relevant period except February 11, 1997, when the company's net worth showed a nominal net worth of $17,324.32 (Stip.41). GCG's net worth as of May 31, 1997, was a negative $193,494.00 (*Id.;* Ex. P–50). Its net worth in May 1998 was a negative $1.285 million (Ex. P–52).

Spivey was generally aware of the financial situation of GCG from 1996 going forward. He was aware that his company, DAC, was being forced to make advances in a substantial amount over an extended period of time in order to keep GCG current in its obligations as required by DAC's contract with the Georgia DOT. He acknowledged that on October 31, 1996, DAC took a tax deduction claiming a $361,000.00 loss, which was the then out-

standing balance shown as due and payable from GCG to DAC. (Ex. P–20). DAC had also guaranteed certain obligations of GCG to enable GCG to obtain equipment necessary for it to perform its subcontract, and Spivey acknowledged that in some cases GCG would have been unable to obtain that equipment without DAC's endorsement. DAC was obligated with GCG to Wildcat Equipment Company (Ex. P–1, P–2, P–3, P–4); DAC also guaranteed payment of GCG's obligation to Ring Power (Ex. P–5) and was aware that Graham Naylor had taken a judgment against GCG in October 1997. Although Spivey professed no present recollection of the transaction, DAC executed a promissory note in the amount of $39,000.00 to satisfy the GCG obligation to Naylor which had been taken to judgment in late 1997. Thereafter, DAC made periodic payments direct to Naylor. (*See* Tr. 112). Spivey was also aware that the Internal Revenue Service had filed a notice of federal tax lien for unpaid employee withholding obligations in March 1998 (Ex. P–12, Tr. 103). The DAC general ledger reveals that regular payments were made to Wild Cat Equipment, Ring Power, Carlton Company and Graham Naylor (Ex. P–20).

In December 1998 GCG ceased doing business because of the attachment of the IRS lien against its receivables, which included future payments due from DAC under the two subcontracts in question. DAC then took over the jobs, hired most of the employees of GCG, and assumed some of GCG's equipment leases. DAC hired Galbreath and his wife and continued their salaries at the same level which they were earning while GCG was in business. In addition, Three G's Trucking, which was owned by Galbreath's wife and which had been formed to qualify as a minority business enterprise, continued doing business with DAC after the shutdown of GCG and earned at least $175,000.00.

**d. Solvency**

Galbreath executed a note in favor of The Coastal Bank in the amount of $62,100.00 in his personal capacity on August 13, 1998 (Ex. P–46). GCG executed a corporate obligation October 24, 1997, in the principal amount of $425,577.56 (Ex. P–47), and Galbreath had personally guaranteed all obligations of GCG in favor of The Coastal Bank by guarantee dated July 3, 1994 (Ex. P–49). Galbreath acknowledged that at all times after August 20, 1998, he owed Coastal more than $500,000.00 as a result of these documents. During their banking relationship, Galbreath provided personal financial statements to Coastal on at least three occasions. The earliest, dated October 1, 1997, showed a personal net worth of $1,761,119.00 (Ex. P–56). The next, dated September 22, 1998, showed a personal net worth of $1,020,253.00 (Ex. P–57), and the latest, dated December 22, 1998, showed a personal net worth of $768,300.62 (Ex. P–58). Despite his testimony that at all times he owed DAC for GCG's outstanding obligations, Galbreath did not list any obligation to DAC as a current personal liability on any of these personal financial statements; nor did he list his half-million-dollar indebtedness to Coastal Bank.

Galbreath testified that he believed the personal financial statement was accurate at the time he delivered it to Coastal Bank, but he now asserts that not all his personal debt was listed. After adjusting the personal financial statements by deducting the $2 million in debt, which he acknowledges, to Coastal and to DAC, he admits, and I find as fact, that: (1) if the DAC debt is included, he was insolvent on September 22, 1998, and on December 22, 1998; and (2) if the DAC debt is not included, then his execution of the 1998 Note and the assumption of the $1.5 million in debt for

the first time rendered him insolvent. There was no material change in his financial condition between the date of the execution of the $1.5 million note in favor of DAC and the date of either of the 1998 financial statements.

Galbreath also omitted any listing of his one-third interest in the Hutchinson Island property, his $1.8 million debt to SunTrust, and the equity in his farm of approximately $240,000.00. Spivey was questioned concerning the value of the Hutchinson Island property in August 1998 and acknowledged that it would have had some value above the indebtedness owed on that date to SunTrust. In fact, he listed its market value on a financial statement dated December 31, 1998, as $2.4 million (Ex. P–74, Tr. 123). Based on Spivey's financial statement, although I have no expert testimony as to the land value, I infer that the Hutchinson Island property was worth no more than $2.4 million on this date and that the debt was $1.8 million. Since Galbreath had a one-third interest, his share of the equity would have amounted to no more than $200,000.00 and, together with the equity in the farm, would not in any event change the conclusion that he was insolvent on August 20 [6] or was rendered insolvent by the execution of the note.

Galbreath's effort to assume liability for a pre–1998 personal obligation for GCG's debt to DAC was consistent at trial, but inconsistent with prior statements or actions he took. At about the same time as the execution of the note, Galbreath delivered personal financial statements to Coastal Bank which failed to disclose any debt to DAC. Galbreath testified at trial

that he mistakenly omitted the DAC note from his personal financial statements given Coastal Bank because, although he owed the money, it was a business debt that he believed should be kept separate from his personal debt. In a discovery deposition he stated that the debt was omitted from the statements because "I didn't borrow it personally." (Dep. of Galbreath at 49). Galbreath testified that he was personally obligated for corporate debts not only to DAC, but to other vendors as well, many of which he claims to have made the same oral assurances to. However, in the bankruptcy schedules filed in his case (Ex. P–75), Galbreath shows the DAC obligation as not contingent and not disputed (Schedule "D") whereas in Schedule "F" he lists numerous GCG creditors with the notation "potential personal liability for corporate debts." Galbreath never made any payment from personal funds to reduce the GCG obligation on the note. In short, his testimony and his conduct on the issue of personal liability are contradictory.

e. **Summary of the Brannen Closing**

When Galbreath and GCG executed the $290,000.00 note, and secured it by the conditional assignment of the 25 acre tract and the mortgage on the 76 acre tract, the promissory note was attached as Exhibit "A" when both security documents were filed for record in the Office of the Clerk of the Superior Court of Chatham County, Georgia. On October 30, 1997, DAC, acting through Joel and Ronnie Spivey, executed a quit claim deed reconveying the 76 acres to Galbreath and recited that "the debt had been paid in full."

---

**6.** Galbreath acknowledged that by December of 1998 he was also personally obligated for approximately $394,000.00 on federal withholding obligations, although he stated there may have been some additional payments

made there was no evidence to show any additional credits. This obligation had increased during the second half of 1998 by approximately $167,000.00.

In December 1997 Galbreath offered the 25 acre tract as collateral to Coastal Bank (Ex. P–37). The closing was handled by attorney Frank Brannen, who discovered the outstanding encumbrance on the 25 acre parcel and the deed recital that "the debt" secured by the 76 and the 25 acre parcels had been paid in full. Based on this and Galbreath's owner's affidavit that there was no unpaid debt on the 25 acres, Brannen closed the loan (Ex. P–38).

When Brannen subsequently attempted to have DAC release its lien, Spivey declined to do so, despite the earlier quit claim which recited that the debt for which the debt deed was given was paid. Brannen felt the recitals in the deed were legally binding upon Douglas Asphalt as a matter of Georgia real estate law. He ultimately wrote letters initially to Galbreath and later to Spivey requesting the release (Ex. P–77, P–78, and P–79).

### CONCLUSIONS OF LAW

■ 11 U.S.C. § 548(a)(1)(B) provides for avoidance of "constructively fraudulent" transfers and obligations:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
. . . .

The burden for proving constructive fraud falls on the trustee who must show by a preponderance of the evidence that all requirements set out in § 548(a)(1)(B) have

been met. *E.g. Tomsic v. Pitocchelli (In re Tri–Star Techs. Co.),* 260 B.R. 319, 323 (Bankr.D.Mass.2001); *Leonard v. Mylex Corp. (In re Northgate Computer Sys., Inc.),* 240 B.R. 328, 365 (Bankr.D.Minn. 1999).

■ If the trustee proves the elements of constructive fraud, § 548(c) operates to insulate the transaction in certain circumstances:

(c) . . . [A] transferee or obligee of such a [fraudulent] transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

The transferee or obligee who asserts the § 548(c) defense bears the burden to show that the requirements set out in § 548(c) have been met. *E.g., Schwab v. Birches III Prop. Owners Ass'n (In re Hefner),* 262 B.R. 61, 65 (Bankr.M.D.Pa.2001); *Taylor v. Riverside–Franklin Props. (In re Taylor),* 228 B.R. 491, 497 (Bankr.M.D.Ga. 1998).

In this case, Trustee seeks to avoid both the obligation evidenced by the 1998 Note and the transfers effected by the perfection of the security deeds. Trustee contends that Galbreath: (1) first incurred a personal obligation on August 20, 1998, which date was within the one-year period prior to the filing of his case; (2) received less than reasonably equivalent value in exchange for incurring the obligation and making the property transfers; (3) was rendered insolvent by executing the 1998 Note; and (4) was insolvent on November 24, 1998, on which date DAC perfected its security interests in Galbreath's property.

If Trustee proves those contentions, DAC invokes § 548(c), in order to retain

liens on the Three Parcels to the extent that it gave value, in good faith, to Galbreath in exchange for his transfer of the security interests in the Three Parcels. The § 548(c) issues are: (1) to what extent, if any, DAC gave value to Galbreath in exchange for the Property Transfers; and (2) whether, if Galbreath was insolvent at the time of the Property Transfers, DAC had reason to know of Galbreath's insolvency.

As explained hereafter, I conclude that: (1) Galbreath's obligation arose within the one-year avoidability period; (2) Galbreath received less than reasonably equivalent value in executing the 1998 Note and effecting the property transfers; (3) Galbreath's execution of the 1998 Note rendered him insolvent, and he was insolvent at the time DAC perfected its security interests in his property; (4) DAC gave no economic value to Galbreath in exchange for the property transfers; and (5) DAC knew or should have known that Galbreath was insolvent from August 20 to November 24, 1998, the date on which DAC perfected its security interests.

### 1. Galbreath's obligation arose within the one-year avoidability period.

Section 548(a)(1) sets out the first element necessary to prove constructive fraud: the transfer or obligation must have been "made or incurred on or within one year before the date of the filing of the petition." Here, the property transfers were made on November 24, 1998, which date was clearly within the avoidability period. The issue is the date on which Galbreath first incurred the personal obligation evidenced by the 1998 Note.

■■■ Generally, a debt is incurred when a debtor becomes legally obligated to pay. *E.g., FCC v. NextWave Pers. Communications (In re NextWave Pers. Communications)*, 200 F.3d 43, 56 (2d Cir. 1999). A debtor becomes obligated to pay principal indebtedness under a promissory note on the date the note is executed and delivered. *E.g., id.* at 56–57. Here, Trustee contends that Galbreath's obligation to DAC arose on August 20, 1998, and that, prior to that date, Galbreath was not personally obligated to DAC under any legally recognizable agreement.

### A. The Written Instruments

It is abundantly clear that prior to August 20, 1998, Galbreath was not personally obligated to DAC by virtue of any written instrument. The relevant prior written instruments were the subcontracts and the 1996 Note. The subcontracts were executed by GCG only and not by Galbreath personally; therefore, all obligations under the subcontracts rested upon GCG.

■■■ As for the 1996 Note, which was stipulated to have been executed by "Galbreath and Galbreath, Inc.," I find that it was fully satisfied on or before July 31, 1996. State law applies to determine how and in what order payments are to be applied when a debtor owes multiple debts. Under Georgia law, a creditor must apply payments to debt claims as directed by the debtor unless the debtor fails to so direct, in which case "the creditor shall have the right to appropriate the payment at his election," O.C.G.A. § 13–4–42; however, "[w]here the parties have made an agreement respecting the application of payments, it must be observed," *Vienna Citizens Bank v. Bowen,* 169 Ga.App. 896, 899, 315 S.E.2d 437, 440 (1984); *see also Redfearn v. C. & S. Nat'l Bank,* 122 Ga.App. 282, 287, 176 S.E.2d 627, 631 (1970) (holding parol evidence not admissible to vary terms on face of guaranty agreement directing application of payments).

Here, the parties expressly agreed to a repayment plan. The 1996 Note set out specific amounts to be withheld by DAC from the proceeds due GCG each month

from April 1996 through July 1996. The amounts listed totaled the amount due on the note.[7] DAC's records showed that the amount it actually withheld was more than sufficient to satisfy the 1996 Note under its express terms.[8] Because the note contained no future advances provision and DAC withheld an amount sufficient to satisfy the debt evidenced in the note as of July 31, 1996, I find that the 1996 Note was paid in full in accordance with the agreed terms on or before July 31, 1996.[9] Thus, no writing was in existence prior to the one year avoidability period which rendered Galbreath personally liable to DAC.

## B. The Alleged Oral Agreement(s)

DAC contends that Galbreath's obligation to DAC originated in February, 1996, by virtue of certain oral promises from Galbreath to Joel Spivey, that Galbreath continued to personally obligate himself to DAC prior to each advance, that DAC performed in reliance on Galbreath's promises, and that the 1998 Note served simply to memorialize his pre-existing obligation.

The nature of Galbreath's alleged oral promises to DAC was that of a guaranty of GCG's debts. Galbreath testified that he considered the debts to DAC to be company debts. His testimony also revealed that he intended to guarantee the debt and pledge personal assets, if called upon to do so, in order to assure repayment of GCG's obligations.[10] Thus, Galbreath's promises constituted an oral agreement to guarantee GCG's corporate debts.

---

**7.** The 1996 Note recited:

> "The principal sum amount above is the entire amount owed..., consolidating and canceling all previous ... amounts due from Borrower to Lender.... Payments shall be paid ... until this note is paid in full from the proceeds of the following projects on which the Borrower is a subcontractor to the Lender.... Borrower hereby agrees that Lender shall withhold the following amounts due from all payments due to Borrower from Lender from the hereinabove described subcontracts...."

Ex.P–7, at 1–2. The Note then specified amounts to be paid in March, April, May, June, and July, 1996. The total of the listed amounts equaled $290,250.00, the amount of the loan on the face of the Note. *Id.* at 2.

**8.** *See* Findings of Fact, *supra*, part *a*, p. 5.

**9.** Additional evidence supports this finding. A quitclaim deed executed by DAC on October 30, 1997, which conveyed title to the 76 Acre Parcel back to "Galbreath and Galbreath, Inc.," recited that "[t]he debt for which said deed has been given has been paid in full, but said deed had not been cancelled of record." Pl.'s Ex. 25. Although DAC asserts that the deed was not intended to cancel the entire debt but only to free the 76 Acre Parcel so that Galbreath could use it as security to acquire bank financing, the quitclaim deed

was a legal document duly recorded and signed by DAC, and the recital was not boilerplate language but was typed into the document. *See Itel Container Corp. v. M/V "Titan Scan"*, 139 F.3d 1450, 1455 (11th Cir.1998) ("[U]nder generally accepted principles of contract construction, specific clauses take precedence over general ones, and clauses that have been added by the parties preempt form provisions."). Under Georgia law, the cancellation recital is binding on DAC. *See* O.C.G.A. § 24–4–24 ("Conclusive presumptions of law ... include presumptions in favor of ... recitals in deeds ... as against a grantor ...."); *Yaali, Ltd., v. Barnes & Noble, Inc.*, 269 Ga. 695, 696, 506 S.E.2d 116, 118 (1998) ("[§ 24–4–24] prohibits a grantor from denying recitals contained within its deed ....").

**10.** Galbreath testified:

> When I signed or guaranteed something, company, you know, I personally was also guaranteeing it ... The company was borrowing the money. The company ... had a note, and I personally was guaranteeing it with personal assets. I mean, if I wasn't personally guaranteeing, I wouldn't have been putting up all my land around my house that I lived on and farmed, and where the office sits, and other lands for investments that I had personally.

Tr. 180, 181, 183.

In bankruptcy, "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including ... statutes of frauds," and "[a] waiver of any such defense by the debtor after the commencement of the case does not bind the estate." 11 U.S.C. § 558. Here, because state law applies to determine the enforceability of a contract, Trustee asserts, on behalf of Galbreath's bankruptcy estate, the Georgia statute of frauds as an affirmative defense to enforceability of the alleged pre-existing oral agreement.

The Georgia statute of frauds generally operates to preclude enforcement of oral agreements that guarantee the debts of a third party, see O.C.G.A. § 13–5–30(2) (requiring that "[a] promise to answer for the debt, default, or miscarriage of another," to be enforceable, "must be in writing and signed by the party to be charged"). Because the alleged pre-existing obligation to guarantee GCG's debts was not in a writing signed by Galbreath, the agreement is *prima facie* within the statute of frauds.

Due to certain exceptions, however, not every contract within the statute of frauds is unenforceable. Here, DAC asserts several exceptions recognized under Georgia law.

*(1) Statutory part performance exception*

■ Georgia law provides that "[w]here there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the court did not compel a performance," the statute of frauds does not preclude enforcement.[11] O.C.G.A. § 13–5–31(3). This exception requires proof of partial performance as would render it a fraud upon DAC if the Court does not compel Gal-

breath's bankruptcy estate to abide by the terms of the alleged oral agreement. The terms sought to be enforced must have been certain and definite, *Lemming v. Morgan*, 228 Ga.App. 763, 764, 492 S.E.2d 742, 744 (1997), and the promisee must have detrimentally relied on the agreement, *Smith Serv. Oil Co. v. Parker*, 250 Ga.App. 270, 271, 549 S.E.2d 485, 487 (2001), *cert. denied* (Jan. 9, 2002). I find, for the reasons that follow, that DAC did not detrimentally rely on Galbreath's alleged oral promises in making the advances to GCG and that the terms of the alleged agreement were too indefinite to be enforced.

*(i) DAC did not detrimentally rely on Galbreath's alleged oral promises.*

■ Georgia courts require a showing that the part performance resulted "in a benefit to one party and a detriment to the other," *Id.* at 271, 549 S.E.2d 485, so as to have been "consistent with the presence of a contract and inconsistent with the lack of a contract," *Hudson v. Venture Indus.*, 243 Ga. 116, 118, 252 S.E.2d 606, 608 (Ga.1979).

DAC's performance was not inconsistent with the absence of a personal obligation of Galbreath. First and foremost, DAC was obligated by its DOT contract to insure the timely payment of GCG's bills. Failure to do so would have constituted default under its general contract with the DOT. DAC was therefore motivated by the DOT contract, not by Galbreath's assurances, to make the advances to GCG in order to keep the work moving in a timely fashion. Further, the evidence shows that DAC was not ready to cease making advances to GCG even as late as August 1998, and there is no evidence that Joel

---

11. O.C.G.A. § 13–5–31 sets forth two additional exceptions which are not asserted by Defendants.

Spivey ever told Galbreath that the advances would cease if Galbreath did not provide his unlimited personal guarantee of GCG's obligations to DAC. There was no detrimental reliance on any assurances of Galbreath when DAC made its advances.

### (ii) The terms of the alleged agreement were incomplete and vague.

"[A] parol contract sought to be enforced based on part performance must be certain and definite in *all essential particulars*," *Lemming*, 228 Ga.App. at 764, 492 S.E.2d 742 (emphasis added), and the part performance must have been "part performance of an essential element of the contract sought to be proved, and of a character which would render it a fraud on the plaintiff if the defendant refused to comply," *Powell v. Estate of Austin*, 218 Ga.App. 446, 448–49, 462 S.E.2d 378, 380 (1995); *see also, e.g., Bagwell–Hughes, Inc. v. McConnell*, 224 Ga. 659, 659–61, 164 S.E.2d 229, 230 (1968).

Here, DAC asserts that it made the advances to GCG in reliance on Galbreath's oral promises and that the essential terms of the alleged oral agreement were definite and enforceable—that the parties to the contract were known, the nature of the obligation was known, and the amount was certain in the same way that an outputs/requirements contract is certain and enforceable.

I find, to the contrary, that the oral agreement failed to provide essential particulars necessary for enforceability. First, the identity of the parties to the alleged oral agreement is in doubt: it is not clear whether Galbreath made his alleged oral assurances of repayment in his role as president and owner of GCG, or as an individual. The verbal assurance by the owner of a small company that s/he will guarantee repayment of a corporate debt is quite ambiguous as to whether s/he is making that guarantee as chief executive officer and spokesman for the company or in a personal capacity. Galbreath's statements and his conduct are similarly ambiguous. The evidence taken in its entirety fails to support a conclusion that his "guarantee" was anything more than assurance that he would devote his best efforts as chief executive officer to insure that GCG repaid DAC. While Galbreath took his responsibilities as owner of GCG seriously and felt responsible for GCG's commitments, there was conflicting evidence as to whether he was actually personally liable for all of GCG's debt.[12]

---

12. When asked why he had not listed debts for which he was personally liable to The Coastal Bank and DAC on his financial statement, Galbreath explained: "Well, what I always done was kept all my personal stuff on a sheet. And then I had the company financial statement. Even though it was both, I kept them, I guess in my mind and on paper, separated. The same reason that Coastal Bank debt was not on there, even though I had borrowed it personally it was for company purposes. And I kept it separate." Tr.148.

At deposition, however, Galbreath had testified that GCG, not he himself, was indebted to DAC, as shown by the following exchange at trial:

Q: [B]eginning on page 46 in my prior deposition to you we were referring to the financial statement date 9/22/98, which is the one we're talking about here. That's Exhibit 57. "Did you also owe a million and a half dollars to Douglas at that time? You had already signed a debt deed to them also in a note. Is that right?" You answer was: "Yes, sir, the company owed them." Was that your answer at that time?

A: Yes, sir. I don't remember exactly, but if that's what it says, that's what it is.

Q: All right. Then I said, "[W]ell, you personally had signed that note, though; hadn't you." And you said, "I probably did, but the company is the one that

Second, the nature of Galbreath's alleged promises is uncertain. DAC contends that Galbreath assumed a then current primary liability to DAC in his conversations with Joel Spivey. The understanding which emerges from the testimony of Galbreath and Spivey, however, is less than clear with respect to Galbreath's then current intentions: whether he intended to assume immediate personal liability or whether he simply intended to signal his willingness to become liable and to pledge his assets as security at some future point in time, when called upon to do so by DAC. "[P]romises concerning the future, especially where those promises concern unenforceably vague future acts" are unenforceable. *Bridges v. Reliance Trust Co.*, 205 Ga.App. 400, 403, 422 S.E.2d 277, 280 (1992).

Notwithstanding his willingness at trial to assume GCG's obligation to DAC, during 1997 and 1998 Galbreath treated GCG's obligations and his own personal obligations as separate. While the Note established Galbreath's personal obligations to DAC as of August 20, 1998, the Court is left to pinpoint by conjecture the precise earlier moment when Galbreath allegedly assumed a personal obligation. Precluding such judicial conjecture is one function of the statute of frauds. *Cf. Burns v. Dees*, 252 Ga.App. 598, 602, 557 S.E.2d 32, 36 (2001) ("A court will not enforce an agreement where it is left to ascertain the intention of the parties by conjecture.").

Third, other essential terms of the alleged oral agreement between Spivey and Galbreath were indefinite. There was no evidence that the parties ever agreed on the exact terms of repayment—whether

monthly, annually, on demand, or in a lump sum on a day certain. Neither was there evidence as to the rate of interest to be charged or for default provisions for the enforcement of the oral obligation. If enforceability of the oral agreement had been at issue, a court could not have filled in the gaps by speculating what the parties intended the terms to have been. *See id.*

Because DAC did not detrimentally rely on Galbreath's alleged personal assurances and because the terms were too vague to be enforced, *see, e.g., S.E. Underwriters v. AFLAC*, 210 Ga.App. 444, 446, 436 S.E.2d 556, 558 (1993) ("If the parties do not create a complete binding agreement, the courts are powerless to do it for them or afford a remedy for a breach." (citation omitted)), I conclude that a court's refusal to compel performance of the oral promises would not have rendered it a fraud of Galbreath against DAC. It follows that this Court's refusal to treat the oral agreement as a contract enforceable on its "terms" on the date it came into existence does not now constitute a fraud of Galbreath's bankruptcy estate against DAC. Therefore, the part performance exception is not applicable.

### (2) Subsequent writing exception

DAC also invokes exceptions provided in Georgia case law. The first is the "subsequent writing" exception. A writing made subsequent to the origination of an oral guaranty may remove an otherwise unenforceable oral contract from the Statute of Frauds. *J.J. Williamson & Co. v. Morgan*, 106 S.E. 916, 918, 26 Ga.App. 713 (1921). Such subsequent writing must be "signed by the party to be charged therewith, *showing that the contract creat-*

borrowed the money. I didn't borrow it personally."
Tr. 150–52. Galbreath also stated, "That's right, the company had borrowed the money

and this is a personal financial statement," Tr. 154.

*ed orally was in fact made* ... provided, of course, that it be shown by the (subsequent writing ... that the contract) ... was *fully intelligible* without parol evidence." *Id.* (emphases added); *see also Beckworth v. Beckworth*, 255 Ga. 241, 245, 336 S.E.2d 782, 786 (1985) ("[S]eparate memoranda will satisfy the statute where the papers contain the whole bargain and make such references to the other written papers as to enable the court to construe the whole of them together as containing *all the terms of the bargain*" (emphasis added)). Thus, notwithstanding the statute of frauds, where a subsequent writing or writings show that "the contract created orally was in fact made," and where a court can determine "all the terms of the bargain" from the subsequent writing or writings, an otherwise non-enforceable oral contract may be enforced.

Here, DAC urges that the 1998 Note is a subsequent writing by virtue of (1) a recital in the 1998 Note which states that "[t]he origination date of this loan is February 22, 1996;" and (2) the similarity in terms between the 1998 Note and the terms of the prior oral agreement.

I conclude that the 1998 Note was not sufficient as a "subsequent writing" to remove the alleged oral agreements between Galbreath and DAC from the statute of frauds because the date recital in the 1998 Note has no probative value in determining whether "the contract created orally was in fact made" and because the essential terms of the alleged oral agreement and the 1998 Note were not the same.

> *(i) The date recital in the 1998 Note has no probative value in determining whether "the contract created orally was in fact made."*

In most situations involving application of an exception to the statute of frauds under state law, the ultimate issue is whether an obligation is enforceable. *See, e.g., Beckworth*, 255 Ga. at 244–47, 336 S.E.2d 782.[13] In contrast, avoidability, addressed in the context of a bankruptcy adversary proceeding, which depends upon a determination of the *date* on which the obligation at issue arose, does not turn solely on the enforceability of a legal obligation under relevant state law. Here, there is no question of enforceability— Galbreath's obligation is clearly enforceable under Georgia law by virtue of his having the executed the 1998 Note. The question is whether the date recital in the 1998 Note is sufficient to establish that Galbreath's personal obligation to DAC actually originated in February of 1996.

---

**13.** Language in *Beckworth,* which opinion was cited by DAC in support of applying the subsequent writing exception, at first glance appears to apply here:

> The statute of frauds does not require that the contract with which it deals be created in writing, but requires only that there shall be written evidence signed by the party to be charged therewith, showing that the contract was made.... Any writing, contemporaneous or subsequent, in which the party charged admits, over his signature, all of the terms of the contract insisted upon by the opposite party, is sufficient. The statute of frauds does not require that all the terms of a contract be written down on one piece of paper, but separate memoranda will satisfy the statute where the papers contain the whole bargain and make such references to the other written papers as to enable the court to construe the whole of them together as containing all the terms of the bargain.

*Beckworth,* 255 Ga. at 245, 336 S.E.2d 782.

The *Beckworth* decision, however, is not entirely on point. Determination of the issue addressed in *Beckworth* turned on the court's accepting multiple writings, none of which specifically stated the terms of the alleged oral agreement, but which taken all together provided evidence of the terms orally agreed upon for purposes of enforceability. *See id.*

I hold that it is not. Galbreath was not the only signatory to the 1998 Note and, by inclusion, the date recital which purported to identify the origination date of *"this loan"* [the $1.5 million loan]. GCG, Savannah Helicopters, and Galbreath Trucking Company also signed the 1998 Note. The date recital is ambiguous: Does it establish a 1996 origination date of a debt owed to DAC by *all four* entities despite lack of proof that Savannah Helicopters or Galbreath Trucking Company ever owed DAC *anything* prior to 1998? Does it establish an obligation of a subgroup of signatories such as GCG and Galbreath? Or was it solely an "admission" by all three new signatories that GCG's debt to DAC, which they were co-signing in 1998, had arisen in February 1996? In short, the recital, insofar as it purports to prove that personal liability of Galbreath for $1.5 million originated in 1996, has no probative value whatsoever.

*(ii) The essential terms of the alleged oral agreement were not the same as those established by the 1998 Note.*

█ If an alleged oral agreement is to be enforced under the subsequent writing exception, the terms of the writing must prove that the oral contract "was in fact made" by identifying its essential terms. *See Beckworth*, 255 Ga. at 245, 336 S.E.2d 782 (noting that subsequent writing or writings must enable court to determine terms of "the whole bargain"). Here, DAC asserts that the essential terms in the alleged oral agreement and the 1998 Note are the same—that the parties and nature of the obligation are the same and that the varying amount of liability is sufficiently determinable.

To the contrary, the essential terms of the 1998 Note and the as-alleged terms of the oral agreement were not the same.

The terms of the 1998 Note were specific and liability thereunder was limited to $1.5 million, whereas the terms of the alleged oral undertaking were indefinite. Galbreath and Joel Spivey testified that Galbreath agreed to assume responsibility for "whatever the company owed" and that he was willing to "put up everything he owned" as collateral. (Tr. 79, 80, 84). Indeed, under the oral agreement, DAC contends that Galbreath is liable for a debt exceeding $1.5 million in that GCG's debt as of August 20 exceeded $1.78 million. A debt of $1.783 million is not "fully intelligible,"without reference to parol evidence, when the subsequent writing is limited to $1.5 million. *See Morgan*, 106 S.E. at 918. Further, Galbreath's and Spivey's testimony fail to establish any repayment terms, interest rate, remedies on default or to identify specific collateral, and no testimony was offered that any other party was aware of these or other terms. The 1998 Note, in contrast, identified a due date, identified and described collateral, set out borrower's duties and waivers, and contained provisions for calculating interest, dealing with default issues, and making advances against the Note.

Finally, as already noted, the 1998 Note does not establish the identity of the obligor or obligors, as of 1996. Because the date recital is fatally ambiguous and the oral terms and the note terms are different in numerous material respects, the 1998 Note does not serve as a subsequent writing within the scope of the exception.

*(3) Original undertaking exception*

Finally, DAC invokes the "original undertaking" exception. To this end, DAC urges that Galbreath, as sole shareholder of GCG, was furthering his own interests in orally agreeing to be personally liable for GCG's debts and that DAC thus qualifies for the exception.

■ Language in Georgia opinions defines certain parameters by which factfinders are authorized to apply the original undertaking exception. An "original undertaking" includes an undertaking by which the promisor becomes *primarily* liable, *e.g. Scott Hudgens Realty & Mortgage v. Executive Action, Inc.*, 125 Ga.App. 81, 82, 186 S.E.2d 504, 505 (1971)("A promise to pay the debt of another which is an original undertaking by which the promisor becomes primarily liable is not within the Statute of Frauds."), and encompasses an undertaking whereby the promisor is "furthering his own interests *rather than* underwriting the debt of another," *Schwab U.S.A., Inc. v. Perpetual Mach. Co.*, 241 Ga.App. 13, 14, 525 S.E.2d 719, 720 (1999) (emphasis added). Moreover, Georgia courts have often required such an undertaking to have effected a substitution of parties. *See, e.g., Litland v. Smith*, 247 Ga.App. 277, 278, 543 S.E.2d 468, 470 (2000) ("even if we were able to consider the merits of [the plaintiff's] argument, he would not prevail. In order for a promise to be considered an original undertaking, the new promisor, for valuable consideration, must *substitute* himself as the party who is to perform, and the *original primisor must be released.*" (emphases added)); *White House, Inc. v. Winkler*, 202 Ga.App. 603, 606–07, 415 S.E.2d 185, 188 (1992) (holding major shareholder's promise to guarantee corporate debts not original undertaking, in part because corporation was not released from liability); *Cordray v. James*, 19 Ga.App. 156, 156, 91 S.E. 239, 239 (1917) ("In all such cases, in order that the promisor shall become bound for the obligation, it is requisite that the credit shall be given exclusively to the promisor; for, if the effect of such an agreement between the promisor and the seller should be that such third person is also to be responsible, then in such event, the contract would be merely one of suretyship, and not an original undertaking.").

The parties in oral argument and in their briefs struggled, as has the Court, with determining whether the alleged oral agreement was within the statute of frauds because it was a promise to answer for the debt of another or whether it is outside the statute of frauds because it was an original undertaking of Galbreath. Much of the dispute centered around the issue of whether, in order for such an agreement to be binding, there must have been a substitution of Galbreath personally in the place of the corporation, GCG. DAC believes that substitution is not a prerequisite where advances are made following or concurrent with the promise. Trustee believes that substitution is an absolute requirement.

The leading modern case on which DAC relies is *B.J. Howard Corp. v. Skinner, Wilson & Strickland*, 172 Ga.App. 180, 322 S.E.2d 306 (1984). The Georgia Court of Appeals, citing several earlier cases set out the parameters for identifying an original undertaking:

> For a promise to pay the debt of another to be within the Statute of Frauds it must be one which is collateral or secondary and is merely superadded to that of another. A promise to pay the debt of another which is an original undertaking by which the promisor becomes primarily liable is not within the Statute of Frauds. If the agreement of the third party guarantor is an original undertaking[,] that is, one furthering his own interests rather than underwriting the debt of another, it is not within the Statute of Frauds. *Whether a promise to assume the debt of another is an original undertaking or a collateral one is a question of intent and whether the parties meant for the promisor to stand in the place of the third party.*

*Id.* at 180–81, 322 S.E.2d 306 (emphasis added) (internal citations and punctuation omitted) (finding sufficient evidence to support jury verdict holding individual controlling shareholder primarily liable for corporate debts of corporations controlled by same individual because creditor looked *exclusively* to individual for payment).

■ The *Howard* court's explanation of the distinction between the promise to pay the debt of another and an original undertaking is instructive. A collateral or secondary promise is within the statute, whereas an original undertaking whereby the promisor becomes primarily liable is not. *Id.* Further, whether a promise is an original undertaking or a collateral promise is a question of intent—whether the promisor and the promisee intended that the promisor stand in the place of the third party.

Courts finding original undertaking nearly always have gleaned the parties' intent in the light of a "common factual element . . . [either] the extension of credit . . . or a party otherwise changing his position, in reliance on the promise." *Mgmt. Recruiters v. J & B Smith Co.*, 184 Ga. App. 662, 663, 362 S.E.2d 462 (1987). For example, in *Lindsey v. Heard Oil Co.*, 170 Ga.App. 572, 317 S.E.2d 597 (1984), the corporation's credit had been terminated, and there was evidence that the credit had been extended *solely* on the basis of the individual owner's subsequent promise of payment. *Id.* at 573, 317 S.E.2d 597. Likewise, in *Wells v. W.S. Williams, Jr., Inc.*, 178 Ga.App. 202, 342 S.E.2d 384 (1986), credit had been cut off to the corporation and further credit was extended *only* after the promisor intervened and promised payment from his personal funds. *Id.* at 202, 342 S.E.2d 384. The court found sufficient evidence for a jury to find an original undertaking on these facts. *Id.* at 202–03, 342 S.E.2d 384. In

*White House*, 202 Ga.App. at 607, 415 S.E.2d 185, the court reversed summary judgment because a factual issue remained as to whether plaintiff had detrimentally relied on the guarantor's promise in performing its part of a contract. Again, in *Zagoria v. Dubose Enterprises, Inc.*, 163 Ga.App. 880, 296 S.E.2d 353 (1982), *reversed on other grounds*, the court held that, because the promisee looked to both the original debtor and the individual, and because it had suffered no detriment, no original undertaking had occurred.

■ Therefore, whether "substitution" is required need not concern this Court. What does interest this Court are the crystal clear and oft-repeated statements by the Georgia Court of Appeals that the statute of frauds precludes enforceability where the parties intended a third party's liability to be "merely superadded" to another's liability, regardless of whether the debt guaranteed was existing or new. *See Schwab*, 241 Ga.App. at 13, 525 S.E.2d 719; *Donald H. Gordon Co. v. Carswell*, 184 Ga.App. 701, 704, 362 S.E.2d 483, 486 (1987); *B.J. Howard*, 172 Ga.App. at 180–81, 322 S.E.2d 306; *Scott Hudgens*, 125 Ga.App. at 82, 186 S.E.2d 504.

■ Here, applying the "intent" requirement, I find that the parties did not intend Galbreath to become the party primarily liable for GCG's debts; rather, they intended Galbreath's promises to be collateral and "merely superadded" to GCG's liability. All indicia of the parties' intent make it clear that the advances were made to GCG and to GCG alone and that, at most, Galbreath intended to guarantee the debt if GCG failed to make payment. First, a fair reading of Spivey's and Galbreath's testimony makes it clear that at the time of their conversations, they both intended GCG to be the primary obligor. They testified that GCG had borrowed the money and that Galbreath guaranteed

GCG's debt.[14] In addition, all the checks that were delivered to a "Galbreath" entity were payable to GCG or to Galbreath, Inc., *see* Ex. P–20; Stip. 24, 25, not to Galbreath personally. Finally, at no time did DAC cut off GCG's credit only to resume it after DAC received the assurances of Galbreath. Rather, the testimony was uncontroverted that, without respect to any assurances that it may have received from Galbreath, GCG continued to make advances, never threatened to cut off GCG's credit, and was under immense pressure due to its contractual obligations to the DOT to make those payments. At the time the first conversations between Spivey and Galbreath took place, Galbreath's obligation was neither primary nor joint with GCG, but was merely secondary and contingent. His obligation did not ripen into a primary obligation until he signed the 1996 Note. After that obligation was fulfilled at the time the terms of the 1996 Note were satisfied, any additional oral promises by Galbreath were again intended by the parties to be secondary and contingent until he executed the 1998 Note.

I conclude, therefore, that even if Galbreath felt responsible as sole shareholder for the performance of his company and viewed himself as a guarantor of the company's obligations, he was clearly not the primary obligor and did not "intend to stand in the place of the third party." Galbreath's alleged oral promises to DAC were, at most, assurances to pay if GCG were unable to do so. DAC did not detrimentally rely on these assurances, and the "original undertaking" exception is not applicable.

### C. Conclusion

Because Galbreath executed the 1998 Note on August 20, 1998, because he was not personally obligated to DAC by virtue of any written instrument prior to August 20, 1998, because his alleged pre-existing obligation is unenforceable under the Georgia statute of frauds, and because no exception applies to remove the alleged oral agreement from the statute, I conclude that Galbreath's obligation to DAC arose within one year of filing. Trustee has proved by a preponderance of the evidence the first requirement for avoidability of the 1998 Note as constructively fraudulent.

### 2. Galbreath received less than reasonably equivalent value in executing the 1998 Note and effecting the property transfers.

Section 548(a)(1)(B)(i) sets out the second element necessary to prove constructive fraud: the debtor must have "received less than reasonably equivalent value in exchange" for incurring the obligation or making the transfer. The trustee bears the burden of showing that a transfer was not made for reasonably equivalent value. *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 726 n. 1 (11th Cir.1990) (Edenfield, J., sitting by designation). In the context of determining avoidability under § 548, "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2)(A).

### A. 1998 Note

Obligations incurred solely for the benefit of third parties are generally not supported by reasonably equivalent value. *See, e.g., Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981) ("If the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing

---

14. Tr.151, 77.

in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation.") (discussing "fair consideration" requirement under former Bankruptcy Act); *Coan v. Fleet Credit Card Servs. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr.D.Conn.1998) ("Transfers made or obligations incurred solely for the benefit of third parties do not furnish reasonably equivalent value, unless the debtor's net worth is unaffected because [he] received a direct or indirect *economic benefit* from the transfer." (emphasis in original)); *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400 (Bankr.S.D.Fla. 1991) ("In general, transfers made solely for the benefit of third parties do not constitute 'reasonably equivalent value' for purposes of [11 U.S.C. § 548]."). Galbreath received no reasonably equivalent value in exchange for guaranteeing the obligation of GCG unless he received, in exchange, a direct or indirect benefit sufficient to conserve his personal bankruptcy estate for the benefit of his creditors.

■ In this Circuit, where a "debtor's net worth has been preserved" in a transaction the "reasonably equivalent value" requirement is met. A debtor's net worth is preserved where he incurs an obligation in order to satisfy or secure a then-existing debt, *see* § 548(d)(2)(A), or where he incurs the obligation in exchange for a direct or indirect benefit sufficient to preserve the debtor's net worth, *Rodriguez*, 895 F.2d at 727–28; *accord Rubin*, 661 F.2d at 991–92.

■ Here, because Galbreath had no personal liability for GCG's debts prior to executing the 1998 Note, he did not incur the obligation in order to satisfy or secure an antecedent personal debt. Because advances in excess of $1.5 million had already been made, it is also clear that Galbreath received no *direct* economic benefit when he signed the 1998 note. Therefore, the decisive issue is whether the transaction conferred an *indirect* economic benefit [15] upon Galbreath sufficient to preserve his net worth.

■ In *Rodriguez*, the Eleventh Circuit addressed the question of reasonably equivalent value in deciding a constructive fraud issue. The trustee sought to set aside certain monthly payments made by the corporate debtor Domino, a holding company, to its subsidiary's creditor, General Electric Credit Corporation ("GECC"), on a plane financed by GECC for the subsidiary. *Id.* at 726–27. The bankruptcy court, holding that Domino received no economic benefit from making payments on behalf of its subsidiary, explained:

> If Domino's payments to [GECC] had created an equity in the aircraft for Domino's subsidiary equal to the payments it made or if the continued availability of the plane to [the debtor's sole owner] and [other companies owned by the same owner] were equated ... with an equivalent increase in Domino's net worth, I would find that Domino received an indirect benefit from a three-sided transaction which was reasonably equivalent value for the transfers. Obviously, however, it did not. There is no blinking at the fact that on this record

---

15. In order to be evaluated for reasonable equivalency, indirect benefits must be *economic* benefits. *Rodriguez*, 895 F.2d at 728 (discussing necessity of economic benefit sufficient to preserve debtor's net worth); *Mel-* *lon Bank v. Metro Communications, Inc.*, 945 F.2d 635, 646–47 (3d Cir.1991) (noting need for indirect benefits to have measurable value for comparison with obligations incurred by bankrupt debtor).

Domino's net worth was not increased one iota by the payments it made to [GECC].

*Murphy v. Gen. Elec. Cred.of Tenn. (In re Rodriguez)*, 77 B.R. 939, 941–42 (Bankr. S.D.Fla.1987). Affirming, the Eleventh Circuit held that, in order for the benefits to have conferred an economic benefit which constituted reasonably equivalent value to Domino, it had to be shown that Domino, the parent corporation, had shared in the enjoyment of the economic benefits enjoyed by its subsidiary. *Rodri-* *guez*, 895 F.2d at 728. Because, absent piercing the corporate veil, a debtor is not responsible for the liabilities of its subsidiaries, Judge Edenfield ruled that Domino did not benefit from any reduction in the subsidiary's indebtedness. *Id.* at 728–29. Nor did Domino benefit economically from the use of the plane itself because the plane was used strictly by its sole shareholder. *Id.* at 728. In short, there was no enhancement or preservation of Domino's net worth which resulted from the payments.[16]

---

**16.** DAC asserts that an exception exists where a debtor and a third party are so related or situated that they share an identity of interests because, in essence, a benefit conferred upon one benefits the other. While the cases relied upon by DAC recognize such a general rule, none are controlling here.

In *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988), the sole Eleventh Circuit decision, the court recognized the general principle, *see id.* at 1199 n. 7, but did not apply it as part of its holding, which was that the defendant was not even the recipient of a transfer—a necessary threshold issue, *id.* at 1201–02.

Bankruptcy court rulings are no more compelling. In *In re BBL Group*, 205 B.R. 625 (Bankr.N.D.Ala.1996), a creditors plan was confirmed over the objections of management *Id.* at 637. The plan paid 100% of the unsecured creditors' claims and extinguished a § 548 claim asserted by management. *Id.* at 627. In assessing whether to approve the plan and its abandonment of the § 548 claim, the court considered the potential "reasonably equivalent value" defense. It approved the compromise in consideration of multiple factors, including the likelihood of success, the uncertainty of outcome, expense and delay to continue litigation, the "paramount" interest of creditors who unanimously voted for the plan, and last but not least, the fact that management which, despite extensive opportunities to develop a case, failed to present "any evidence to the court beyond their own bare assertions" that a valid claim existed. *Id.* at 634–37. In *Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.)*, 23 B.R. 28 (Bankr.N.D.Ala.1982), the court recognized the general principle but held, due to commingling of funds between parent and subsidiary and the failure to maintain separate records, that the trustee had failed to prove that the debtor had transferred any of its own property. *Id.* at 31. In *Wright v. Affiliated Home Centers, Inc. (In re Wright)*, 18 B.R. 408 (Bankr.W.D.Mich.1981), the court ruled only on the adequacy of consideration under Michigan law and on § 548 actual fraud, not on § 548 constructive fraud. *Id.* at 410–11. In *Pembroke Development Corp. v. Commonwealth Savings & Loan Ass'n (In re Pembroke Development Corp.)*, 124 B.R. 398 (Bankr.S.D.Fla.1991), the court held that a cash payment made to a lender to obtain modification deferring interest, deferring maturity of loan and forbearing commencement of foreclosure held reasonable value as to a debt owed by affiliated company and guaranteed by debtor. *Id.* at 400–01. Here, there was no forbearance or other action taken by DAC in exchange for Galbreath's signature, and Galbreath was not, prior to August 1998, an obligor.

The Fifth Circuit Court of Appeals held in *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993), that payments for fuel for a regional airline by a debtor aircraft manufacturer/vendor/financier were supported by reasonably equivalent value due in part to the benefits received from keeping the airline business afloat while attempting to sell it as a going concern. *Id.* at 1123–24, 1126, 1129. The court also relied, however, on a fact not present in the case at bar: had the payments not been made by Fairchild, the regional airline would have shut down. *Id.* at 1126. Fairchild had sold and financed three aircraft with an average profit of $800 million per

Here, the only balance sheet change that occurred when Galbreath signed the note was to increase his liabilities by $1.5 million. He received no money or credit. GCG already had received the advances so its cash position did not increase. Because the net worth of GCG was not increased, the company had no added value, and Galbreath as sole shareholder enjoyed no boost to his personal financial statement.

DAC contends that Galbreath received certain economic benefits in exchange for executing the 1998 Note, specifically, salary and use of company vehicles, payments to creditors to whom Galbreath was personally liable, and the opportunity to return GCG to a strong financial position. The issue is whether these benefits qualify as economic benefits which satisfy the requirements for "value" set out in § 548. Pursuant to the following discussion, I conclude that they do not.

First, with respect to the salary and use of a company car that, I find that Galbreath did not receive those indirect economic benefits "in exchange for" executing the 1998 Note. Galbreath did not receive the salary in a lump sum at the time he executed the 1998 Note; nor was he entitled to receive it without regard to whether he was working. In fact, Galbreath and his wife were not added to DAC's payroll until GCG ceased operations in December, 1998. There was no evidence that Gal-

breath expected to work for DAC in the future at the time he signed the 1998 Note; indeed, he testified that DAC never promised him or his wife a job if he would personally sign the note. Therefore, the evidence shows that Galbreath received a salary and used the vehicles only after his employment by DAC began, an event which was not anticipated at the time the 1998 Note was executed.

Second, with respect to the payments made by DAC to GCG's creditors whose debts were guaranteed by Galbreath, the evidence shows that those payments were not made "in exchange for" Galbreath's executing the 1998 Note. The advances made by DAC during 1996 through 1998 went to pay GCG's obligations, some of which Galbreath had guaranteed, and some of which he had not guaranteed. Those payments, however, which totaled $1.783 million, had already been made prior to August 20, 1998. Nothing further was paid at that point in time "in exchange" for Galbreath's signature.

Third, *all* advances—those made prior to August 20, 1998 as well as those made after that date—were made because DAC was obligated under its DOT contracts to ensure that all bills incurred by its subcontractors, including GCG, were paid in full and obligated DAC to pay if its subcontractors failed to do so.

plane. If the airline shut down, Fairchild would have been forced to repossess the aircraft and to write off its $2.4 million profit from the aircraft sale. In turn, its ability to effectively market new planes which were then for sale would have been impaired. *Id.* at 1126–27. (The court concluded that "the benefits flowing to Fairchild from keeping Air Kentucky in operation is likewise value for purposes of § 548 .... [and that] the value realized by Fairchild for fuel payments made while Air Kentucky was still flying was sufficient to constitute reasonably equivalent value."). Thus, clear evidence existed that the

payments had a direct effect of preserving or enhancing Fairchild's balance sheet, *id.* at 1126, similar to the controlling precedent in the Eleventh Circuit, *see Rodriguez*, 895 F.2d at 728 (holding that conferring economic benefit so to preserve net worth is necessary for finding "reasonable equivalent value"); *see also Mellon Bank*, 945 F.2d at 646–48 (finding indirect benefit where guaranty enabled related company to obtain new credit for working capital). In the instant case, however, no new money came as a result of the new note, and there was no preservation or enhancement of Galbreath's balance sheet.

Fourth, there was no evidence to support a finding that any of this cash flow ever enhanced Galbreath's personal balance sheet—that the net amount paid to creditors guaranteed by Galbreath exceeded new obligations accruing to those same creditors—or that the value of the payments ever approached the $1.5 million amount of the 1998 Note. In other words, there was no evidence that Galbreath personally benefitted, after all the payments and advances were "netted out." Indeed, the evidence is clear that his financial condition continued to worsen between August, 1998, and December, 1998. As a result, Galbreath's bankruptcy estate was depleted.

Finally, although the opportunity to return GCG to profitability may well have been, from Galbreath's perspective, received "in exchange for" his assuming liability for GCG's debts, that opportunity was, viewed objectively, nothing more than a roll of the dice which was highly speculative and which, neither prospectively nor in hindsight, provided a "reasonably equivalent" exchange of value to Galbreath. At the time the 1998 Note was executed, GCG had a negative net worth,[17] the value of its good will was nominal at best, and its cash flow had been insufficient to meet current obligations for more than two years. In exchange for executing the note, GCG received no new money for working capital nor any forbearances from DAC. Although it continued to receive advances from DAC for a time, those advances, which raised GCG's debt to DAC from $1.7 million to $2 million, were never conditioned upon Galbreath's execution of the 1998 Note, and they exceeded the $1.5 million cap in the note. Under the circumstances, the opportunity to keep a hemorrhaging business on life support was simply not reasonably equivalent to $1.5 million. I find, therefore, that Galbreath's mere hope for GCG's financial recovery was not an economic benefit by which his personal net worth was prospectively likely to be preserved; nor was his net worth in fact preserved.[18]

## B. The Property Transfers

"The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of the bankrupt's estate." *Rodriguez*, 895 F.2d at 727. Thus, with respect to the Property Transfers, the question is whether the relative values of economic interests exchanged between Galbreath and DAC were economically equivalent so as to preserve Galbreath's net worth and protect his estate creditors. *See Rubin*, 661 F.2d at 988–89 (noting that debtors' transactions made under threat of insolvency depleted estate of assets without bringing in consideration similar in value by which creditors' claims could be satisfied). Galbreath had equity in the property pledged in August 1998. He received no direct or indirect benefit when he executed the security deeds. Thus, his asset position was diminished, in addition to the increase of his liabilities of $1.5 million. Because Galbreath's financial position prior to the Property Transfers was stronger

---

**17.** GCG's net worth was negative $193,494 on May 31, 1997, and declined to negative $1,258,000 by May 31, 1998. (Tr. 132–33).

**18.** Even in cases in which an "identity of interests" is recognized and where certain indirect benefits may thus qualify as "value," an ultimate question remains: that of "determining the value of this vicarious benefit and testing it by the measure of 'reasonably equivalent' for the property transferred by the insolvent debtor," *Royal Crown Bottlers*, 23 B.R. at 30. Here, as shown in the discussion above, any prospective hope of indirect benefit to Galbreath must fail the test of reasonable equivalency.

than it was after the transfers, it is clear that the transfers resulted in less property available for distribution to his bankruptcy estate and inevitable injury to his creditors. Therefore, Galbreath did not receive an economic benefit by effecting the Property Transfers.

## C. Conclusion

Because Galbreath's net worth and the value of his bankruptcy estate were reduced by his execution of the 1998 Note and by the Property Transfers, I conclude that he did not receive reasonably equivalent value in exchange for executing the 1998 Note and effecting the Property Transfers. Trustee has satisfied the second requirement for constructive fraud.

**3. Galbreath's execution of the 1998 Note rendered him insolvent, and he was insolvent at the time DAC perfected its security interests in his property.**

Section 548(a)(1)(B)(ii)(I) sets out the third element necessary to prove constructive fraud: the debtor must have been "insolvent on the date that such transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation." An individual is "insolvent" if his financial condition is "such that the sum of [his] debts is greater than [the value of] all of [his] property, at a fair valuation," without taking into account exempted or fraudulently conveyed property. § 101(32).

The evidence shows that Galbreath's execution of the 1998 Note rendered him insolvent and that DAC perfected its security interest in the Three Parcels while he was insolvent. First, Galbreath admitted he was insolvent. (Tr.140). Second, Galbreath testified that the information in fi-

nancial statements prepared for The Coastal Bank, which showed a $1 million net worth, was accurate except for the omissions of a $500,000 debt to The Coastal Bank and the DAC obligations. His execution of the 1998 Note in the amount of $1.5 million, together with the Coastal debt, reduced that net worth to a negative $1 million, thus rendering him insolvent. Finally, Galbreath's testimony shows that he remained insolvent from August 20, 1998, at least until the Security Interest Transfers were perfected on November 22, 1998.[19] None of this evidence was refuted.

DAC contends that Trustee failed to value Galbreath's interest in the Hutchinson Island property, and that that failure is fatal to Trustee's case. The evidence before the Court, however, shows that Galbreath's Hutchinson Island equity had at least some positive value, perhaps $200,000, but not enough value to place Galbreath in a solvent position.[20] The amount of the encumbrance on the property was less than the original purchase price, and Galbreath testified that in August, 1998, the property was probably worth slightly more than the purchase price. Galbreath was still insolvent as a result of the execution of the 1998 Note.

DAC also argues that Trustee failed to determine whether Galbreath owned other property omitted from the financial statement. As to this point, the solely significant asset in evidence was Galbreath's interest in the Bulloch County Farm. From the evidence as to its value, I conclude that Galbreath's equity was approximately $240,000.00 (Tr.170). He still was rendered insolvent as a result of the execution of the$1.5 million note. His financial

---

19. Galbreath testified that "[a]ll the numbers were pretty much the same after [August 20, 1998.]" Tr. 140.

20. Spivey specifically denied that he had ever valued the property at a higher figure than $2.5 million. See Tr. 117–118, 123.

statement net worth shortly after August 20 was $ 1 million. Subtracting the Coastal note of $500,000.00 yields $500,000.00. Adding, at most, $200,000.00 for his Hutchinson Island equity and $240,000.00 for his farm equity yields $940,000.00 in approximate net worth before the note was executed. Subtracting the $1.5 million dollar note obligation yields a negative net worth of $560,000.00.

Therefore, neither the 1998 Note nor the Property Transfers can survive the insolvency test. I conclude that Galbreath was rendered insolvent by his execution of the 1998 Note, that he remained insolvent through the end of 1998, and therefore, that the Property Transfers were effected while he was insolvent.[21] Trustee has proved by a preponderance of evidence the third and final requirement for avoidability of both transactions.

**4. DAC gave no economic value to Galbreath in exchange for the Property Transfers, and DAC knew or should have known that Galbreath was insolvent on the date DAC perfected its security interests.**

Section 548(c) acts as a safe harbor for a transferee of a constructively fraudulent transfer pursuant to § 548(a)(1)(B), provided that the transferee can establish that it received the property for value and in good faith, § 548(c). DAC contends that § 548(c) operates to protect DAC's liens on the Three Parcels. As transferee, DAC bears the burden to establish both value and good faith. *E.g. Helms v. Roti (In re Roti)*, 271 B.R. 281, 296 (Bankr.N.D.Ill.

2002); *Salven v. Munday (In re Kemmer)*, 265 B.R. 224, 236 (Bankr.E.D.Cal.2001); *Feltman v. Warmus (In re Amer. Way Serv. Corp.)*, 229 B.R. 496, 525–26 (Bankr. S.D.Fla.1999); *Taylor v. Riverside–Franklin Props. (In re Taylor)*, 228 B.R. 491, 497 (Bankr.M.D.Ga.1998).

A. Value

"Value," in this context, is "property, or satisfaction or securing of a present or antecedent debt of the *debtor*." § 548(d)(2)(A) (emphasis added).[22] I concluded above that there was no present or antecedent personal obligation to be secured or satisfied by Galbreath upon executing the 1998 Note. In order to satisfy the requirement for "value," therefore, DAC must have given Galbreath "property" in exchange for his transferring the security deeds. "Property" connotes economic value. As the preceding discussion illustrates, Galbreath received nothing from DAC at the time of the transfers that would enhance his personal balance sheet.

Nor did Galbreath receive value after August 20, 1998, in exchange for the transfers. As discussed above, since the GCG debt exceeded $1.5 million on August 20, 1998, and because the 1998 Note was capped at $1.5 million, advances made after that date occurred under the subcontracts, not the 1998 Note. Accordingly, those advances cannot be construed as value given for the Property Transfers. In any event, the advances made to GCG after August 20, 1998, did not constitute "value" to "the *debtor*." Absent piercing the corporate veil,[23] GCG and Galbreath

---

**21.** The result as to the property transfers would not change if Galbreath had already been obligated to DAC by virtue of his alleged promises to DAC. In that case, he would already have been insolvent by virtue of preexisting obligations to DAC at the time he executed the property transfers.

**22.** "[A]n unperformed promise to furnish support to the debtor or to a relative of the debtor" is excluded from the definition of "value." § 548(d)(2)(A).

**23.** "The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in

are separate entities, and the advances made after August 20, 1998, constituted "property" only to GCG and not to Galbreath.

### B. Good Faith

 A transferee which reasonably should have known of a debtor's insolvency is not entitled to the good faith element of the defense provided in § 548(c). *See, e.g., Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1338–39 (10th Cir.1996) (reviewing good faith under objective standard); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995) ("To determine whether a transferee acts in good faith, courts look to what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint." (internal quotations omitted)); *Fogel v. Chevrie (In re Chevrie)*, 2001 WL 120132, *13 (Bankr.N.D.Ill.2001) (noting that majority of bankruptcy courts agree that applying objective standard is appropriate in applying § 548(c)). A transferee with sufficient knowledge of facts to place it on inquiry notice of a debtor's possible insolvency reasonably should have known of the insolvency. *E.g., M & L Bus. Mach.*, 84 F.3d at 1335–36; *Sherman*, 67 F.3d at 1355; *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 878 (Bankr.N.D.Ill.2000); *Dev. Specialists, Inc. v. Hamilton Bank (In re Model Imperial, Inc.)*, 250 B.R. 776, 797–98 (Bankr. S.D.Fla.2000); *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 902 (Bankr. D.N.D.1999). "The presence of any circumstances placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith ...." *M & L Bus. Mach.*, 84 F.3d at 1335–36 (quoting Collier on Bankruptcy). Thus, if DAC knew or should have known that the security deeds given to secure the debt evidenced in the 1998 Note were made while Galbreath was insolvent, then DAC failed to act in good faith under § 548(c).

Here, circumstances were such that Joel Spivey knew or should have known that Galbreath was in a precarious financial position. First, prior to entering into the 1998 Note, DAC had already paid off a judgment entered against GCG and an IRS lien filed against GCG for which Galbreath was personally liable. Second, Galbreath had discussed his indebtedness to The Coastal Bank with Joel Spivey prior to asking him to sign the cancellation of the deed securing the 25 Acre Parcel.[24]

---

order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility." *Heyde v. Xtraman, Inc.*, 199 Ga.App. 303, 306, 404 S.E.2d 607, 610 (1991) (quotations and citations omitted). In order to pierce the corporate veil, "it is necessary to show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs ...." *Id.*

The mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends.... More evidence of abuse, such as evidence that the controlling person commingled the corporation's assets with his own or those of other corporations he controlled, or that he failed to maintain corporate records separately, is essential. Abuse of the corporate form occurs when the owner of the corporation conducts his private and corporate business on an interchangeable or joint basis.

*United States v. Fid. Capital Corp.*, 920 F.2d 827, 837 (11th Cir.1991) (internal citations to numerous Georgia cases omitted).

Here, DAC's contention that the corporate veil should be disregarded has no merit. There is no evidence indicating that Galbreath abused the corporate entity.

**24.** *See* Galbreath's testimony, Tr.194. Joel Spivey denied discussing the bank situation with Galbreath; however, a close proximity of

Third, Spivey knew that because his company had been forced to advance $1.7 million to GCG, GCG could not have been credit worthy on its own. He also knew or had reason to know that Galbreath's personal net worth other than the real estate, was essentially co-extensive with the value of GCG. Fourth, Spivey knew that Galbreath was signing a note to DAC for $1.5 million, and was pledging equity in virtually all his property to secure it. This knowledge alone placed Spivey and DAC on inquiry notice of Galbreath's insolvency prior to DAC's perfection of the security deeds.

## C. Conclusion

DAC has failed to establish either the value or good faith prong under § 548(c); therefore, DAC is not entitled to retain a lien against the subject property of the security deeds fraudulently transferred from Galbreath to DAC on November 24, 1998.

## CONCLUSION

I conclude: (1) the promissory note executed by Debtor John Douglas Galbreath in favor of Douglas Asphalt Company on August 20, 1998, is a constructively fraudulent obligation avoidable under § 548(a)(2)(B); and (2) the transfers of Galbreath's interests in the 25.61 acre parcel in Chatham County, Georgia, the 143.4 acre parcel in Bulloch County, Georgia, and the 46.32 acre parcel on Hutchinson Island, Georgia, to Douglas Asphalt Com-

pany as collateral security for the 1998 Note and perfected on November 24, 1998, are constructively fraudulent transfers avoidable under § 548(a)(2)(B).

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the August 20, 1998 promissory note is avoided and set aside. Any claims of Douglas Asphalt Company against Debtor John Douglas Galbreath arising from the note are disallowed and the deeds to secure debt of record in the 25.61 acre real estate parcel in Chatham County, Georgia, the 143.4 acre real estate parcel in Bulloch County, Georgia, and the 46.32 acre real estate parcel on Hutchinson Island, Georgia, are avoided. Douglas Asphalt Company is ORDERED to cancel, and the Clerks of Superior Court where said deeds to secure debt are filed are ORDERED to cancel, said deeds to secure debt of record.

IT IS FURTHER ORDERED that, pursuant to Bankruptcy Rule 7054, I determine that there is no just reason for delay, and direct the entry of final judgment on the claims tried in this bifurcated proceeding.

---

time between Galbreath's receipt of The Coastal Bank's acceleration letter, the Brannen closing, and the execution of the 1998 Note a few days later on August 20, 1998, supports Galbreath's testimony. A similar

"coincidence" occurred prior to DAC's perfecting the security deeds. After the IRS filed a lien against GCG on November 22, 1998, DAC filed the security deeds for record two days later, on November 24, 1998.